IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JOEY KEITH JEFFERY,

      Petitioner,

v.                                         **Case No. 2:19-cv-00045**

DONALD F. AMES, Superintendent,
Mt. Olive Correctional Complex,

      Respondent.

## PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court are Petitioner's Petition for a Writ of Habeas Corpus, (ECF No. 2), and Respondent's Motion for Summary Judgment. (ECF No. 11). This case is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no genuine issues of material factual and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the presiding district judge **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; and **DISMISS** and **REMOVE** this case from the docket of the court.

I.     **Relevant Facts and Procedural History**

In January 2013, a grand jury sitting in Kanawha County, West Virginia returned an indictment charging Petitioner, Joey Keith Jeffery, (hereinafter "Jeffery"), and his co-defendant, Cindy L. Creathers, with Kidnapping, in violation of W. Va. Code § 61-2-14a ("Count One"); Malicious Wounding, in violation of W. Va. Code § 61-2-9(a) ("Count Two"); First Degree Robbery in violation of W. Va. Code § 61-2-12(a) ("Count Three"); and Assault During the Commission of a Felony, in violation of W. Va. Code § 61-2-10 ("Count Four"). (ECF No. 10-1 at 2-3). Ms. Creathers subsequently signed a plea agreement and entered a guilty plea to an information charging her with conspiracy to commit robbery. As part of the plea agreement, Ms. Creathers was required to testify for the State at Jeffery's trial. Jeffery's jury trial on the charges began on February 10, 2014, in the Circuit Court of Kanawha County, West Virginia ("Circuit Court"). (ECF No. 20-1 at 2). He was represented at trial by Shawn Bayliss. (*Id.* at 3).

Prior to trial, the Circuit Court ruled on several pending motions. First, the Circuit Court granted a *motion in limine* filed by the prosecution seeking to prohibit defense counsel from cross-examining a State witness, Erica Hancock, regarding a pending burglary charge. (*Id.* at 5-7). The prosecutor also informed the Circuit Court that there would be testimony presented at trial regarding Jeffery's drug use, because the drug use was intrinsic to the crime and testimony discussing it was unavoidable. (*Id.* at 8). Mr. Bayliss indicated that he did not object to the introduction of this testimony as part of his defense strategy was to use the witnesses' drug use to question the reliability of their testimony. (*Id.* at 8-9). Mr. Bayliss noted that he had previously filed a motion for co-counsel, but that he was prepared to go forward, and Jeffery had assented to commencing trial without co-counsel appointed. (*Id.* at 9).

Following *voir dire* proceedings, the prosecutor outlined the State's case in his opening statement, explaining to the jury how the evidence would show that on December 8, 2012, Jeffery kidnapped Leanna Quinn and subjected her "to a night of terror," involving prolonged beatings, suffocation, stabbing, robbery, and injecting Ms. Quinn with what she believed to be brake fluid. (ECF No. 20-1 at 196-97). Mr. Bayliss, in his opening statement for the defense, told the jury that they would hear "stories of cross and double cross, drugs and deception." (ECF No. 20-2 at 9). Mr. Bayliss stated that the jury would hear from a witness, Mr. Nunley, regarding a phone call from Ms. Quinn in which she asked him to join her in a plot to rob Jeffery. (*Id.* at 10-11). Mr. Bayliss also stated the jury would hear testimony from Ashley Hemmings about a conversation she had with Jeffery's co-defendant, Ms. Creathers, which would reveal that "what really happened" on the night in question was an altercation between Ms. Creathers and Ms. Quinn, precipitated by jealousy due to their mutual romantic pursuit of Jeffery. (*Id.* at 12-13). Mr. Bayliss asserted that medical evidence would also exonerate Jeffery and reveal that Ms. Quinn was fabricating the seriousness of her injuries. (*Id.* at 13).

The State's first witness was Leanna Quinn. (*Id.* at 15). Ms. Quinn testified that she knew Jeffery well and had known him "[a]s far back as I can remember." (*Id.* at 16). The prosecutor asked if it was fair to say she had been in a romantic relationship with Jeffery, and Ms. Quinn answered "[w]e were close." (ECF No. 20-2 at 17). In December 2012, Ms. Quinn had been living with Jeffery "on and off," but was in the process of leaving. (*Id.*). Ms. Creathers also lived with Jeffery and was dating him at that time. (*Id.* at 18).

On December 8, 2012, Ms. Quinn, Jeffery, and Ms. Creathers all stayed at a Knights Inn motel together. (*Id.* at 17-18). Ms. Quinn explained that the three decided to rent a motel room "[j]ust to take a break and go down there." (*Id.* at 19). Ms. Quinn

3

decided to leave after the first night at the motel, however, because Jeffery and Ms. Creathers "had suggested a threesome, and it was just awkward. I didn't want to." (*Id.* at 19-20). Ms. Quinn called the father of her children, and he drove her to the home of a friend, Erica Hancock, who lived in the unincorporated community of Witcher Creek, West Virginia. (*Id.* at 20).

Ms. Quinn next saw Jeffery early the following morning when he arrived at Ms. Hancock's house. (ECF No. 20-2 at 21). Immediately upon arriving, Jeffery began to punch Ms. Quinn and ask her "[w]here is my stuff?" (*Id.* at 21-22). Ms. Quinn stated that Jeffery hit her in the stomach and in the face, striking her at least four times. (*Id.*). Ms. Hancock was present and witnessed the assault. (*Id.* at 21). Jeffery then grabbed Ms. Quinn by her hair and dragged her to his truck, a black Dodge Ram, which was occupied by Ms. Creathers. (*Id.* at 22). Jeffery and Ms. Creathers both were armed with knives. (*Id.* at 22-23). After dragging Ms. Quinn into his truck, Jeffery drove her to his trailer located in the unincorporated community of Simmons Creek, West Virginia. (ECF No. 20-2 at 23).

Jeffery took Ms. Quinn into the trailer where he forced Ms. Quinn to lie down on trash bags he spread across the living room floor. (*Id.* at 23-24). Jeffery threatened to cut Ms. Quinn's hands off and began to beat her with an axe handle, striking the back of her hands. (*Id.* at 24). Jeffery became irate at Ms. Quinn for bleeding and failing to stay on the trash bags. (*Id.* at 23-24). Jeffery then electrocuted Ms. Quinn by shocking her with the exposed wire of an electrical cord. (*Id.* at 25). Ms. Quinn recalled Jeffery injecting a fluid into her with a needle, telling her the needle contained brake fluid and bleach. (*Id.*). Jeffery also kicked Ms. Quinn as she lay on the floor and put a trash bag over her head. Throughout the encounter, Jeffery repeatedly asked Ms. Quinn where his "stuff" was and

4

who had broken into his house. (ECF No. 20-2 at 26). Ms. Quinn believed Jeffery was referring to controlled substances he had stored at the trailer. (*Id.* at 27). Ms. Quinn believed Jeffery was going to kill her and begged him and Ms. Creathers to let her leave. (*Id.* at 30).

After several hours, during which Jeffery continued to kick and beat Ms. Quinn, Jeffery put Ms. Quinn back in the truck and the three left the trailer. (*Id.* at 30-31). They drove to the residence of Ms. Quinn's uncle, Dorsey Woolwine. (*Id.* at 32). Mr. Woolwine was also an acquaintance of Jeffery. Ms. Quinn, who was at that time a "bloody mess," begged her uncle to "[p]lease get me away from him. Get me away from him." (ECF No. 20-2 at 33). Mr. Woolwine however said he had "no use for" Ms. Quinn and gave Jeffery a gun, telling him to "get [her] out of there." (*Id.*).

Jeffery next called Ms. Quinn's stepfather, Jay Brisendine, and told him to meet them near a graveyard in the Simmons Creek area. (*Id.* at 35). Ms. Quinn relayed to the jury that when her stepfather saw her, "he looked scared to death," because she was a "mess" from the abuse Jeffery had inflicted on her. (*Id.* at 36). Jeffery told Ms. Quinn to tell her stepfather that she had been beaten by Erica Hancock and Erica's husband, Kevin Hancock. Ms. Creathers held a knife to Ms. Quinn's side to force her to comply with this demand. (*Id.*). Ms. Quinn's stepfather said "I don't want anything to do with this. I don't want nothing to do with it." He got back in his truck and left. (*Id.* at 36-37).

Jeffery then drove Ms. Quinn to the top of a mountain located between Simmons Creek and Witcher Creek. (ECF No. 20-2 at 38-39). Once they arrived at the top of the mountain, the three got out of the truck. Jeffery kicked and punched Ms. Quinn some more and put a trash bag over her head. (*Id.* at 39). Jeffery took Ms. Quinn's rings, coat, and shoes. He threatened to kill her children if she told anyone what he had done. Jeffery

forced Ms. Quinn to lie down on her belly and suffocated her with the trash bag. (*Id*. at 39-40). Jeffery removed the bag, pointed the gun at Ms. Quinn, and threatened to kill her and her family unless she told anyone who asked that Kevin and Erica Hancock were the ones responsible for beating her. (*Id*.). Jeffery fired a shot from the gun that traveled past the side of Ms. Quinn's head.

Jeffery then aimed the gun at Ms. Quinn's face. (*Id*. at 42). He pointed and said "Witcher is that way" and directed Ms. Quinn to walk off the mountain. Ms. Quinn believed Jeffery would shoot her as she walked away, but when he and Ms. Creathers got in the truck and drove away, Ms. Quinn began to run down the mountain. (*Id*. at 45). Ms. Quinn walked down the mountain barefoot and without a coat until she reached a house. (ECF No. 20-2 at 46). Ms. Quinn knew the occupants of the house, Debbie and Ernie Medford. Ms. Quinn stated it was a "blur" from there, and the next thing she remembered was her mother picking her up at the Medford's residence. (*Id*.). Ms. Quinn was brought to the police station where she gave a statement. (*Id*. at 46-47).

The prosecution then introduced a series of pictures of Ms. Quinn taken by the police, which Ms. Quinn confirmed accurately displayed the injuries inflicted on her by Jeffery. (*Id*. at 50-55). Ms. Quinn testified that cuts on her forehead and the side of her face depicted in the pictures were inflicted by Ms. Creathers. (*Id*. at 54-55). Ms. Quinn stated that she was taken to the hospital and received stitches in her hand. (*Id*. at 57). Ms. Quinn made an in-court identification of Jeffery. ((ECF No. 20-2 at 58).

On cross examination, Ms. Quinn denied ever having a sexual relationship with Jeffery or Ms. Creathers. (*Id*. at 59-60). Ms. Quinn confirmed that Jeffery was her cousin. (*Id*. at 60). She also conceded  that she used methamphetamine and Xanax while staying at the Knights Inn with Ms. Creathers and Jeffery. (*Id*. at 60-61). Mr. Bayliss asked Ms.

Quinn if she knew Scott Nunley, and she replied that he was also her cousin. (*Id.* at 63). When Mr. Bayliss asked Ms. Quinn if she knew Mr. Nunley in "other ways too," the prosecutor objected, and a bench conference was held outside of Jeffery's presence. (*Id.*).

Mr. Bayliss explained that he intended to show that Ms. Quinn had a relationship with Mr. Nunley, who was her "pimp." (ECF No. 20-2 at 64). Mr. Bayliss wanted to show that "Ms. Quinn and [Jeffery] first got involved by him pimping her out." (*Id.*). The Circuit Court sustained the prosecution's objection, and, over Mr. Bayliss' objection, forbade Mr. Bayliss from pursuing that line of questioning. (*Id.*).

Resuming his questioning, Mr. Bayliss asked Ms. Quinn if she and Ms. Hancock went to Jeffery's trailer after leaving the motel. (*Id.* at 70-71). Ms. Quinn replied that they did go to Jeffery's trailer in order to retrieve her suitcase. She denied taking anything else from the trailer. (*Id.* at 71). Ms. Quinn also denied arguing with Ms. Creathers earlier in the day before leaving the motel. (*Id.* at 72). However, Ms. Quinn affirmed that Jeffery never cut her with a knife, and her only knife wounds came from Ms. Creathers. (ECF No. 20-2 at 75).

Following the conclusion of trial that day, the Circuit Court engaged in a colloquy with a juror, James Lloyd, with both counsel and Jeffery present. (*Id.* at 81). Mr. Lloyd informed the Circuit Court that he had belatedly realized he knew Ms. Creathers personally as she used to date his brother-in-law. (*Id.* at 83). Mr. Lloyd said his brother-in-law had told him that Ms. Creathers was "crazy" and "into the drugs [sic]." (*Id.* at 84). After the parties were given the opportunity to further question Mr. Lloyd regarding his personal knowledge of Ms. Creathers, the Circuit Court determined that Mr. Lloyd should be excused from trial, and an alternate juror should serve in his place. (*Id.* at 91-92). Accordingly, Mr. Lloyd was excused.

Prior to the commencement of trial the following day, Mr. Bayliss approached the Circuit Court with a motion requesting a mistrial or continuance. (ECF No. 20-2 at 97). Mr. Bayliss explained that they had a "gigantic problem" in that a "main witness" had recently suffered a stroke and was unable to testify. (*Id*.). The State objected, noting that the defense had already filed numerous continuances due to difficulty in finding witnesses willing to cooperate. (*Id*. at 105). The Circuit Court determined that the motion was premature because the State had not finished putting on its case, and the witness might be available by the time the State rested. (*Id*. at 103-04).

The State began the second day of trial by calling Mike Phantom as a witness. (*Id*. at 110). Mr. Phantom explained that he was employed as an administrator at Metro Communications and his job duties included retrieving recorded 911 emergency calls. (*Id*. at 110-11). Mr. Phantom affirmed that 911 calls were recorded in the "normal course of business," and there were procedures in place to ensure that calls were recorded uniformly and accurately. (ECF No. 20-2 at 111). Mr. Phantom testified that he responded to a subpoena from the State requesting recorded calls related to an incident that occurred on December 8, 2012 near Simmons Creek. (*Id*. at 111-12). In response to that subpoena, "another girl in the office," placed some recorded calls on an audio disc in accordance with the procedures in place at Metro Communications. (*Id*. at 112). The State then moved for the admission of two recorded 911 calls, one made by Erica Hancock and one made by another individual. (*Id*. at 112-14). Mr. Bayliss stated he did not object to the admission of the calls as "a regular kept business record," but did object to their admission for the truth of the matters asserted, arguing that the content of the calls was hearsay. (*Id*. at 113). The recordings were admitted.

The State's next witness was Trooper Brian Ward of the West Virginia State Police.

(*Id*. at 116-17). Trooper Ward testified that on December 8, 2012, he received an alert to be on the lookout for a vehicle suspected of being involved in a kidnapping. (ECF No. 20-2 at 117-18). As Trooper Ward was searching for the vehicle, he was notified that the vehicle had been located at a Knights Inn motel in Kanawha City. (*Id*. at 120). Upon arriving at the Knights Inn motel, Trooper Ward observed the vehicle in question—a black Dodge Ram truck—and noted that it had recently been driven in mud. (*Id*. at 121). Trooper Ward stated that when he first arrived at the scene, two women approached him and began talking excitedly. One of the women asserted that her name was Leanne (the victim) and spoke to Trooper Ward in a rambling and disjointed manner. The other woman, identified herself as the person who had placed the 911 call and claimed that the woman calling herself Leanne was, in fact, responsible for harming and kidnapping the victim, Ms. Quinn. (*Id*. at 121-22). Trooper Ward later determined that the woman calling herself Leanne was actually Ms. Creathers. (*Id*. at 123).

Trooper Ward next spoke with Jeffery, whom Charleston Police had placed in a chair outside of his motel room. (*Id*. at 122-23). When asked, Jeffrey denied that Ms. Quinn was in the motel room, but gave Trooper Ward permission to enter the room and looked for Ms. Quinn, whose whereabouts were still unknown. (ECF No. 20-2 at 124). Trooper Ward testified that he was concerned Ms. Quinn had been harmed and might be in need of assistance. (*Id*.). When Trooper Ward looked inside the motel room, he observed bloody clothing and towels laying on the floor. He exited the room and told Charleston police officers to obtain a search warrant for the room. (*Id*. at 125). In a search made pursuant to that warrant, Trooper Ward discovered female shoes and clothing with what appeared to be blood on them. (*Id*.). A picture of the shoes in question was admitted as an exhibit. (*Id*. at 126). The search of the motel room also yielded drug paraphernalia.

9

Trooper Ward stated that while searching for Ms. Quinn, he opened the door of the black Dodge Ram truck to see if she was in the vehicle and observed napkins with what appeared to be blood on them. Trooper Ward shut the door, and a search warrant was later obtained for the vehicle. (ECF No. 20-2 at 127). A search pursuant to that warrant returned a number of knives. (*Id.* at 128).

Later that night, Trooper Ward obtained a search warrant for Jeffery's trailer located in Simmons Creek. (*Id.* at 128-29). Trooper Ward noticed that Jeffery's trailer had multiple surveillance cameras, which suggested to Trooper Ward that the residence was used for drug activity. (*Id.* at 129). Trooper Ward also observed that the door to the trailer had been "messed with" as if someone had forcibly opened it. (*Id.*). Immediately upon entering the trailer, Trooper Ward saw blood splatter throughout the room and a wooden handle near the door. (*Id.* at 130). He also saw plastic laid down on the floor of the trailer with blood droplets scattered over it. (ECF No. 20-2 at 134). The state submitted multiple photographs of the trailer and items found within. (*Id.* at 132-36). Among these items was a wooden axe handle, which was submitted to the state lab for further testing. (*Id.* at 132-33).

Trooper Ward testified that Ms. Quinn was subsequently found and escorted to the State Police detachment in Quincy, West Virginia. (*Id.* at 138). Trooper Ward took a statement from Ms. Quinn, noting that she appeared to be "battered and beaten, and bruised." (*Id.* at 139). She also displayed some cuts and dried blood, most notably on her hands, which were "scraped up pretty bad" as if she had either been cut or stopped herself from falling. (*Id.* at 140-41). Trooper Ward interviewed Ms. Quinn prior to her receiving medical treatment. (*Id.* at 141). The prosecutor showed pictures taken of Ms. Quinn while at the State Police detachment. (ECF No. 20-2 at 142). Trooper Ward expressed his belief

that Ms. Quinn had been "cleaned up" before the pictures were taken. (*Id.* at 141).

On cross-examination, Trooper Ward again affirmed that the door of Jeffery's trailer appeared to have been pried open, indicating a possible break-in. (*Id.* at 146). Trooper Ward confirmed that Jeffery's truck contained a number of personal effects including clothes, a television, tools, and a jug filled with change. (*Id.* at 147-48).

The State's next witness was Trooper R.R. Cervera, a corporal with the West Virginia State Police. (*Id.* at 152). Corporal Cervera executed the December 8, 2012 search warrant on Jeffery's room at the Knights Inn motel. (*Id.* at 155). Through the introduction of photographs, Corporal Cervera identified a number of items seized from the motel room; including, bloody napkins and a bloodstained pair of jeans. (*Id.* at 157-60). Corporal Cervera also performed a search of Jeffery's trailer, where he discovered blood droplets, a small baseball bat, and an ax handle with apparent bloodstains. (ECF No. 20-2 at 162-63). Corporal Cervera performed a search on the black Dodge Ram as well and sent bloody napkins and several knives to the police lab for further testing. (*Id.* at 164-72).

Crystal Workman was next to testify for the State. (*Id.* at 177). Ms. Workman explained that she was employed as a forensic analyst in the deoxyribonucleic acid ("DNA") identification division of the West Virginia State Police Forensic Laboratory. (*Id.*). Ms. Workman's job duties included creating DNA profiles from evidence submitted by investigating agencies and comparing that profile to known DNA profiles submitted to the laboratory. (*Id.* at 177-78). Ms. Workman was recognized by the Circuit Court as an expert in DNA testing. (*Id.* at 179).

Ms. Workman testified that she worked on the case involving Jeffery, Ms. Quinn, and Ms. Creathers. (*Id.* at 181). In the course of working on that case, Ms. Workman tested

a number of evidentiary items for DNA material and compared it to known DNA profiles for Ms. Quinn, Ms. Creathers, and Jeffery. (ECF No. 20-2 at 182-83). A test of a sample obtained from a bat taken from Jeffery's trailer returned a positive match for Ms. Quinn. (*Id.* at 183-84). Tests of samples obtained from a rug taken from the living room of Jeffery's trailer, jeans taken from the Knights Inn motel room, and the passenger floor board of the Dodge Ram truck all returned results consistent with the DNA profile of Ms. Quinn. (*Id.* at 184-85). A sample taken from the driver's seat of the Dodge Ram truck returned results consistent with the DNA profile of both Ms. Quinn and an unidentifiable third individual. (*Id.* at 186). Finally, a sample taken from a knife seized in connection with the case revealed results consistent with the DNA profile of Ms. Creathers. (*Id.* at 187-88). Ms. Workman confirmed that the DNA tests revealed that Ms. Quinn's blood was on the items that returned a positive result. (*Id.* at 188). On cross examination, Ms. Workman confirmed that the DNA samples she tested returned results only for Ms. Creathers and Ms. Quinn, and none contained results identifying a positive match for Jeffery. (ECF No. 20-2 at 190-91).

Prior to calling the next witness, Ms. Creathers, the parties discussed an issue regarding Mr. Creathers's testimony at her plea hearing. (ECF No. 20-3 at 2). At the hearing, while laying the factual basis for her plea, Ms. Creathers stated that Jeffery told Ms. Quinn "I am going to kill you and I am going to put you in the same hole as Melanie [Metheny] where I put her."[1] (*Id.* at 2). The prosecutor stated that Ms. Creathers had been instructed not to mention this statement in her testimony due to the prejudicial effect

---

[1] Melanie Metheny disappeared from Belle, West Virginia after dropping her children off at a daycare center on July 19, 2006. The case of her disappearance remains unsolved and has generated a significant amount of public interest. *See* Amanda Barren, *Melanie Metheny Missing Now for 12 Years,* WSAZ News Channel https://www.wsaz.com/content/news/WSAZ-Investigates-Missing-Melanie--420957633.html.

reference to this "highly publicized case" might have on the trial. (ECF No. 20-3 at 2). However, Mr. Bayliss relayed to the Circuit Court that he intended to use the statement in an effort to impeach Ms. Creathers's testimony, showing that she had made fanciful claims in an effort to obtain a more favorable plea bargain. (*Id.* at 3). Mr. Bayliss believed Ms. Creathers's statement regarding Jeffery's involvement with the disappearance of Melanie Metheny was akin to "her saying [Jeffery] was on [the] grassy knoll in Dallas." (*Id.* at 4).

After a recess, the bench conference reconvened without the presence of Jeffery. (ECF No. 20-3 at 7). Mr. Bayliss informed the Circuit Court that upon conferring further with Jeffery, the defense now moved to exclude any testimony referring to Melanie Metheny. (*Id.*). The parties also discussed methods of obtaining the testimony of the defense witness who had suffered a stroke and was hospitalized. (*Id.* at 8-10). Prior to the entrance of the jury, the Circuit Court was presented with the defense's requested limitation instruction regarding the recorded 911 telephone calls. (*Id.* at 13).

Ms. Creathers took the stand and testified on behalf of the State. (*Id.* at 14). Ms. Creathers informed the jury that she was currently serving a sentence of incarceration as a result of her guilty plea to a charge of conspiracy to commit robbery, stemming from the same incident for which Jeffery was currently being tried. (*Id.* at 16). The prosecutor asked Ms. Creathers why she had agreed to cooperate with the State and testify against Jeffery, and Ms. Creathers responded: "I just felt like the truth was the truth. So if we had to come here and all of this had to happen, I was just going to tell the truth." (ECF No. 20-3 at 17-18).

Ms. Creathers stated that she knew Ms. Quinn well and they had been friends for close to ten years. (*Id.* at 18). Ms. Quinn would often stay at Jeffery's residence in

Simmons Creek. (*Id*. at 19). Ms. Creathers, Jeffery, and Ms. Quinn frequently used drugs together. (*Id*. at 19-20). In December 2012, the trio decided to stay at a Knights Inn motel in Kanawha City "[j]ust to get away from everybody," and due to a lack of running water at Jeffery's residence.. (*Id*. at 20). Jeffery borrowed a black Dodge truck from Mr. Dorsey Woolwine to drive to the motel. (ECF No. 20-3 at 21). The first night at the motel, December 6, 2012, Jeffery fell asleep and Ms. Quinn and Ms. Creathers spent the night together, "just piddling around." (*Id*. at 22). The next day, December 7, 2012, Jeffery paid for another night at the motel, but Ms. Quinn left mid-day to visit her children. (*Id*. at 23-24). In the early morning hours of December 8, 2012, Jeffery woke Ms. Creathers up and said they should go check on his trailer because "he felt like something might have been wrong." (*Id*. at 24). Ms. Creathers and Jeffery had been using methamphetamine and Roxicodone while staying at the motel. (*Id*. at 25).

While on the way to Jeffery's residence, they spotted Ms. Quinn traveling in a car with Erica Hancock. (ECF No. 20-3 at 25). The two followed Ms. Hancock and Ms. Quinn to Ms. Hancock's home and parked their truck behind Ms. Hancock's car. Ms. Quinn went into the house to use the restroom. As Ms. Creathers was talking to Ms. Hancock, Jeffery noticed numerous items that belonged to him in Ms. Hancock's car, including a five-gallon water jug filled with change, flat screen televisions, and tools. (*Id*. at 27). Jeffery became irate at seeing his belongings in the car and began to question Ms. Hancock and her husband, Kevin, about the items. Ms. Hancock explained that Ms. Quinn called from her mother's house and asked for a ride. When Ms. Hancock arrived, Ms. Quinn was standing in front of her mother's house with the items. Ms. Hancock did not know to whom the items belonged. (*Id*. at 27-28). Jeffery demanded to speak with Ms. Quinn, so Ms. Hancock called for her to come out of the house. As Ms. Quinn existed the residence,

Jeffery struck her in the face. (*Id*. at 29). Ms. Creathers testified that Erica and Kevin Hancock both witnessed the beating, but "[t]hey just turned around like they didn't see it happening. So I didn't know what to do." (*Id*.).

Jeffery, while wielding a knife, ordered Ms. Creathers and Kevin and Erica Hancock to move the stolen items into the truck Jeffery was driving, warning them "[i]f you don't, I will gut all three of you." (ECF No. 20-3 at 29-30). Ms. Creathers stated that she was afraid of Jeffery and "didn't want to put myself in a position where I would be the one getting hit or to be hit," so she did as Jeffery ordered. (*Id*. at 31). Jeffery forced Ms. Quinn into the truck and handed Ms. Creathers a knife, instructing her to "cut" Ms. Quinn if she moved. (*Id*. at 32). Jeffery then drove Ms. Quinn and Ms. Creathers to his trailer in Simmons Creek. (*Id*. at 33).

Upon arriving at his trailer, Jeffery realized the locks on his door had been broken, and he became even more enraged. (*Id*. at 34). Jeffery grabbed Ms. Quinn by her hair, pushed her into the trailer, and threw her onto the floor. (*Id*.). Jeffery repeatedly kicked Ms. Quinn in the head and body, demanding that she tell him where the rest of his belongings were. (ECF No. 20-3 at 35). Jeffery instructed Ms. Creathers to gather up all the drug paraphernalia in the trailer, put it in a bag, and remove it, which she did. (*Id*. at 37-38). Ms. Creathers left the room so she "didn't have to watch what he was doing to [Ms. Quinn]," but could hear Jeffery kicking her and Ms. Quinn begging him to stop. (*Id*. at 38). Ms. Creathers returned to the trailer and watched Jeffery peel back the wire on an extension cord, which he proceeded to stick in Ms. Quinn's pants to electrocute her. (*Id*. at 39). At that point, Ms. Quinn appeared to be insensate and did not react to the wire; however, Ms. Creathers could smell burning skin when the wire was touching Ms. Quinn. (*Id*.). Jeffery took Ms. Quinn's jewelry from her and repeatedly struck her hands and feet

with an axe handle. (*Id*. at 40).

Ms. Creathers testimony was paused while a bench conference was held wherein the prosecutor informed the Circuit Court she had realized Ms. Creathers had never been sworn in. (ECF No. 20-3 at 41). The jury was brought back into the courtroom and Ms. Creathers was sworn in. (*Id*. at 54). The Circuit Court then asked Ms. Creathers if she had been "honest and truthful" in her prior testimony in court, and Ms. Creathers asserted she had been. (*Id*.).

Picking up with her testimony, Ms. Creathers stated that she took Ms. Quinn to use the restroom and noticed her hands looked like "meat" from the beatings. (*Id*. at 55-56). Ms. Quinn was bleeding so profusely from her head, "you couldn't see anything but her eyes." (*Id*. at 56). Ms. Creathers testified that she wiped the blood off Ms. Quinn and bandaged a hand that was bleeding, telling her "I was sorry I couldn't help her." (*Id*.). Ms. Creathers explained that she was afraid to help more, because she believed that if she tried, Jeffery would hurt her as well. (*Id*. at 57). Ms. Creathers witnessed Jeffery inject water into Ms. Quinn's neck with a needle, telling her it was brake fluid and bleach. (ECF No. 20-3 at 59-61). Ms. Creathers admitted that she was a participant that night, saying "I did what I was told to do. And went along with whatever, so that I didn't have to feel what she was feeling." (*Id*. at 57).

After some time, the three got back in the truck with Ms. Quinn seated between Ms. Creathers and Jeffery. (*Id*. at 63-64). Jeffery called Ms. Quinn's stepfather and told him to come meet them on the side of the road. (*Id*. at 64). When Ms. Quinn's stepfather arrived and observed Ms. Quinn covered in blood, he stated, "I don't want anything to do with that," and got back in his vehicle and left. (*Id*.). Ms. Quinn begged her stepfather to take her with him, but he did not. (*Id*.).

Jeffery then drove to Mr. Woolwine's house and got out of the truck, handing Ms. Creathers a knife and instructing her to not let Ms. Quinn escape. (ECF No. 20-3 at 66-67). When Mr. Woolwine and Jeffery returned to the truck, Ms. Quinn begged Mr. Woolwine to take her to the police station. (*Id.* at 67). Mr. Woolwine replied that when she had stolen from Jeffery, she had stolen from him as well, and told Jeffery, "I don't care what you do, take her up on the hill and kill her if you want to." (*Id.*). Mr. Woolwine gave Jeffery a small revolver, and Jeffery got back in the truck and drove away. (*Id.* at 67-69).

Jeffery then drove onto a dirt road that led to the top of a mountain between Witcher Creek and Simmons Creek. (*Id.* at 69). Jeffery told Ms. Quinn he was going to take her up to the top of the mountain and "put her in a hole." (*Id.* at 70). When they reached the top of the mountain, Jeffery told Ms. Quinn to get out and led her down a path. (ECF No. 20-3 at 71). Jeffery pointed the gun at the back of Ms. Quinn's head, and she began to pray. Jeffery then fired the gun next to Ms. Quinn's head. (*Id.*). Jeffery ordered Ms. Quinn to stand up and take off her shoes and coat. He took the shoes and coat and told Ms. Quinn to start walking down the mountain. (*Id.* at 71-72). Jeffery told Ms. Quinn, "If you hit pavement or you tell anybody what I did, I will kill you and your kids." (*Id.* at 72). According to Ms. Creathers, Ms. Quinn began running down the mountain, and Jeffery shot at her feet as she fled. (*Id.*).

Jeffery and Ms. Creathers drove down the mountain and returned to Mr. Woolwine's house. Ms. Creathers witnessed Jeffery enter Mr. Woolwine's residence carrying the firearm and return to the truck without it. (*Id.* at 73). Jeffery and Ms. Creathers returned to the Knights Inn motel and found Erica Hancock and a woman named Cathy Petry waiting for them outside the motel room. (ECF No. 20-3 at 74). Jeffery

told Ms. Creathers not to speak to the women and instructed her to go inside the motel room to wash Ms. Quinn's sneakers and hang up her coat. (*Id.* at 75). Police officers arrived at the motel room shortly after Ms. Creathers and Jeffery arrived. (*Id.* at 80).

Ms. Creathers testified that the police officers knocked on the door of the motel room, and Jeffery opened the door. (ECF No. 20-3 at 81). The police asked if Ms. Quinn was there and wanted to check the room for her, so Jeffery let them in to search. The police then took Jeffery outside and told him to sit in a chair on the landing in front of the room. The officers also took Ms. Creathers outside and began to question her. (*Id.*). She told the officers that she was Ms. Quinn's sister, although she could not provide a reason for doing so.

On cross examination, Mr. Bayliss questioned Ms. Creathers's motive for testifying against Jeffery, pointing out that she had received a favorable plea deal, with multiple serious charges dismissed, in exchange for her testimony. (*Id.* at 84-85). With respect to her relationship with Jeffery, Ms. Creathers explained that she first met Jeffery when she and a friend went to his house to buy pills. (*Id.* at 86). Eventually, she became romantically involved with Jeffery and moved in to his trailer. During the same time frame, Ms. Quinn was living with Jeffery off and on and also had a romantic relationship with him. (*Id.* at 89). Ms. Creathers acknowledged that she, Jeffery, and Ms. Quinn went to the Knights Inn motel in December 2012 to have sex and use drugs together. (*Id.* at 91-92). On the second day of their stay, the three used methamphetamine, Xanax, and Roxycodone. (*Id.* at 90). Later that day, Ms. Quinn left.

Ms. Creathers testified that the next day, she and Jeffery left the motel early in the morning to check on his trailer. When they spotted Ms. Quinn, they followed her to the Hancocks' residence. Mr. Creathers confirmed that Jeffery was incensed over finding his

belongings in Erica Hancock's vehicle. Mr. Creathers also admitted that she participated in the subsequent beating of Ms. Quinn at Jeffery's trailer, stating that she hit Ms. Quinn several times with a wiffle ball bat. (ECF No. 20-3 at 97). However, Ms. Creathers denied ever using a knife to cut Ms. Quinn. (*Id.* at 98).

A recess was taken, and a bench conference was held outside of Jeffery's presence. (ECF No. 20-3 at 108). At the bench conference, Mr. Bayliss discussed the continued unavailability of a witness who had suffered a stroke. (*Id.* at 108-09). When the jury returned, the State rested its case. (*Id.* at 117). Mr. Bayliss moved for judgment of acquittal, arguing the State had failed to meet the minimum burden of production necessary to secure a conviction. (*Id.* at 117-18). The Circuit Court denied the motion. (*Id.* at 119).

Mr. Bayliss informed the Circuit Court that the defense had elected not to call the two witnesses who were present, Mr. Nunley and Ms. Hemmings. (*Id.* at 120). Mr. Bayliss further indicated that a witness for the defense, Tracy Campbell, was hospitalized and unable to testify at that moment. (*Id.*). The Circuit Court dismissed the jurors for the day. (ECF No. 20-4 at 1). A second bench conference was held, again outside of Jeffery's presence. (*Id.* at 3). Mr. Bayliss argued for, and secured the inclusion of, a jury instruction for the lesser included offense of second-degree robbery. (*Id.* at 3-5).

The third day of trial began with a conversation between the Circuit Court and a juror, Karen Hogan. (*Id.* at 9). Juror Hogan informed the Circuit Court that she had recently learned she may have a distant familial relationship to Ms. Quinn. (*Id.*). The exact nature of Juror Hogan's relationship to Ms. Quinn was not made clear by her statements, but it appeared to involve Juror Hogan's daughter-in-law, whose family lived in the Witcher Creek region and may have had a family member, "Mawmaw Deb," in common

with Ms. Quinn. (*Id.* at 9-10). A bench conference was held, without Jeffery being present, and the parties were given the opportunity to question Juror Hogan. (ECF No. 20-4 at 15-16). The following discussion was had:

> Mr. Bayliss: Only thing I would ask, there is nothing in this that would cause you to not be able to fairly consider the evidence that's -in front of you?
>
> Juror Hogan: No, there is not.
>
> Mr. Bayliss: Then we're fine.

(*Id.* at 16-17).

The defense called Tracy Campbell to the stand as its first witness. (*Id.* at 18). Mr. Campbell testified that he had known both Jeffery and Ms. Quinn "all my life," and that Ms. Quinn was his distant cousin. (*Id.* at 19-20). Mr. Campbell then described, over the State's objection, a conversation he had with Ms. Quinn regarding the events that took place on December 8, 2012. (*Id.* at 23-26). Mr. Campbell testified that, as Ms. Quinn described it, the night in question involved only an altercation between herself and Ms. Creathers. Mr. Campbell stated that Ms. Creathers and Ms. Quinn "got in a big fight" and Ms. Quinn decided to leave the motel room the three were sharing. Apparently in an effort to explain the presence of Ms. Quinn's clothing at the motel room when police searched it, Mr. Campbell testified that Ms. Quinn told him that when she was leaving the motel room after the fight, Jeffery asked her "'[w]hat about the coat and stuff I bought you?' She throwed [sic] it at him and said "'[f]uck you. You can have your shit, I don't need it.'" (ECF No. 20-4 at 25). Mr. Campbell asserted that Ms. Quinn never told him that Jeffery had hit her, but she described being struck by Ms. Creathers. (*Id.* at 30).

On cross examination the prosecutor asked Mr. Campbell if it would surprise him that both Ms. Quinn and Ms. Creathers had testified Jeffery had assaulted Ms. Quinn. Mr.

Campbell replied that he would not be surprised because the two were "trying to bail their own self out [sic]." (*Id.* at 32). He believed that what really occurred was "a big love fight" between Ms. Quinn and Ms. Creathers due to jealousy arising from their mutual romantic relationship with Jeffery. (*Id.*). Mr. Campbell further stated that he would not be surprised if Ms. Quinn's blood was in Jeffery's trailer "because [Ms. Creathers] probably whooped her ass really good." (*Id.*).

Mr. Bayliss then brought Ms. Quinn back to the stand for questioning. (ECF No. 20-4 at 35). Ms. Quinn denied ever having a romantic relationship with Jeffery. When confronted with the testimony of Ms. Creathers and Mr. Campbell that she had been romantically involved with Jeffery, Ms. Quinn said they were lying. (*Id.* at 36). Ms. Quinn also denied engaging in group sex with Ms. Creathers and Jeffery and getting into a fight with Ms. Creathers. (*Id.* at 38).

Ms. Quinn acknowledged that, despite testifying that Jeffery punched her, kicked her repeatedly, and hit her with a bat, she did not suffer any broken bones from this incident. (*Id.* at 39). She further acknowledged that she did not have any scars from the beating or electrocution. (*Id.* at 40). Following the testimony of Ms. Quinn, the defense rested. (ECF No. 20-4 at 43). Mr. Bayliss renewed his motion for acquittal, which was denied by the Circuit Court. (*Id.* at 45).

In giving the jury instructions, the Circuit Court admonished the jury that they were not to consider the statements made in the recorded 911 calls for the truth of the matters asserted, as the calls were "offered solely to place the statements in context and make them comprehensible to the jury." (*Id.* at 80-81). In closing argument, the State asked the jury to impose a life sentence of imprisonment without the recommendation of mercy, focusing on the length of time that Ms. Quinn was subjected to abuse and the

nature of that abuse. (*Id.* at 83-93).

The defense, by contrast, emphasized the inconsistencies in the testimony of Ms. Quinn and Ms. Creathers. (*Id.* at 94). Mr. Bayliss also pointed to a lack of corroborating medical evidence for Ms. Quinn's detailed descriptions of abuse. He argued that the State had produced no medical records to establish that Ms. Quinn had been injured in the alleged attack, although those records should have existed if her account of the events was accurate. (*Id.* at 98). Mr. Bayliss referred to Mr. Campbell's testimony describing a different version of events and emphasized that Ms. Quinn denied having a sexual relationship with Jeffery despite the testimony of the other witnesses, calling into question her credibility. (ECF No. 20-4 at 99-100). Mr. Bayliss stated that Ms. Creathers had "cut a deal" with the State of West Virginia and was attempting to escape responsibility by blaming the entire incident on Jeffery. (*Id.* at 101).

Following closing arguments, a bench conference was held outside of Jeffery's presence, wherein the parties assented to the jury instructions being sent in with the jury to the deliberation room. (*Id.* at 109-11). The jury left the courtroom for deliberations at 12:11 p.m. and returned with a verdict at 2:48 p.m. (*Id.* at 113-14). The jury found Jeffery guilty of kidnapping under Count One, but attached a recommendation of mercy. (*Id.* at 116). The jury further found Jeffery guilty of malicious wounding under Count Two, and assault during the commission of a felony as contained in Count Four. (*Id.*). The jury determined that Jeffery was not guilty of first-degree robbery under Count Three, and instead found him guilty of the lesser included offense of second-degree robbery. (*Id.*).

Jeffery's sentencing hearing was held on April 9, 2014. (ECF No. 10-25). Before starting the hearing, the Circuit Court denied a previously raised motion for a new trial. (*Id.* at 4). The prosecutor requested that the Circuit Court impose the maximum potential

sentence, arguing that Jeffery committed many acts of gratuitous cruelty during the commission of his crimes. (*Id.* at 5-6). The prosecutor also emphasized Jeffery's criminal history, noting that he had previous convictions for violent crimes, including unlawful wounding and an animal cruelty conviction obtained for beating several puppies to death. (*Id.* at 8-9). Ms. Quinn's mother presented a victim impact statement to the Circuit Court. (*Id.* at 10). She informed the Circuit Court that Ms. Quinn "will never be the same" after the incident, and that she continued to suffer psychologically following the kidnapping. (*Id.*).

Mr. Bayliss asked the Circuit Court to set Jeffery's sentences to run concurrently. (ECF No. 10-25 at 15). Mr. Bayliss emphasized that the jury saw fit to grant mercy to Jeffery, and that Jeffery suffered from drug addiction and mental health issues. (*Id.* at 13-14). Mr. Bayliss moved for a diagnostic evaluation in light of Jeffery's history of mental health issues in order to construct an effective rehabilitation plan for Jeffery while he served his term of incarceration. (*Id.* at 14). The Circuit Court ultimately sentenced Jeffery to 15 years to life on the kidnapping conviction, 2-10 years for the malicious wounding conviction, 5-18 years for the second-degree robbery conviction, and 2-10 years for the assault during the commission of a felony conviction. These sentences were ordered to run consecutively. (*Id.* at 19). The practical effect of the sentences was that Jeffery would serve a mandatory minimum of 24 years in jail, with credit for time-served, and then be eligible for parole. (*Id.*). The Sentencing Order imposing the sentence was entered on April 16, 2014. (ECF No. 10-3 at 3). On April 24, 2014, an identical Second Resentencing Order was entered. (ECF No. 10-4).

On July 22, 2014, Jeffery submitted a *pro se* motion asking that his sentence be reconsidered. (ECF No. 10-5 at 2). In support, Jeffery asserted that he had family

members who relied on his support, that he was "very remorseful," that he had sought to rehabilitate himself through independent studies, and that he was committed to becoming a productive member of society. (*Id.* at 3). On July 24, 2014, the Circuit Court entered an Agreed Resentencing Order for the purpose of re-setting the deadline within which Jeffery could file an appeal. (ECF No. 10-6 at 2).

Jeffery's brief on direct appeal was submitted on November 25, 2014. (ECF No. 10-8 at 22). In the brief, Jeffery raised the following assignments of error:

> 1. May a defendant be convicted based on evidence obtained through an invalid search warrant?
>
> 2. May a defendant be convicted based on his co-defendant's testimony where the trial court abused its discretion in admitting said testimony, given that the co-defendant bolstered her own credibility and had great motive to testify dishonestly, including avoiding a significant amount of incarceration?
>
> 3. Is the evidence introduced in this case insufficient to meet the beyond a reasonable doubt standard and support the jury's verdict?

(*Id.* at 6). Jeffery later withdrew the assignments of error in grounds 1 and 3 and proceeded solely on the claimed error raised in ground 2. (*Id.* at 4, 6). On January 9, 2015, the State submitted a response brief, disputing Jeffery's contention that the Circuit Court erred either in admitting Ms. Creathers' testimony, or by permitting her to "bolster" her own credibility. (ECF No. 10-9 at 9). On January 29, 2015, Jeffery submitted a Reply brief, arguing that Ms. Creathers testified to "several obvious lies," making her testimony plainly inadmissible. (ECF No. 10-10 at 5). Jeffery contended that the State acted unethically in allowing Ms. Creathers to present testimony minimizing her role in the kidnapping and suggesting she participated only at the direction of Jeffery, when the State had taken the position that Ms. Creathers had "minimized her involvement in the crime to some degree" at Ms. Creathers' plea hearing. (*Id.* at 5-6).

24

On April 13, 2015, the Supreme Court of Appeals of West Virginia ("WVSC") issued an opinion denying Jeffery's appeal and affirming his conviction. (ECF No. 10-11 at 2). The WVSC first noted "we have long held that a '[c]onviction for a crime may be had upon the uncorroborated testimony of an accomplice. . ." (*Id.* at 3) (quoting *State v. Humphreys,* 128 W. Va. 370, 381 (1945)). The WVSC went on to observe that in Jeffery's case, the testimony of Ms. Creathers did not stand alone, but was significantly corroborated by other testimony and evidence in the record. (*Id.*). The WVSC held that, as the jury was correctly instructed not to infer Jeffery's guilt based on his co-defendant's guilty plea, the trial court had not committed an error in allowing Ms. Creathers' testimony to be admitted. (*Id.* at 4).

The WVSC further held that the State had not allowed Ms. Creathers to improperly bolster her credibility in violation of Rule 608 of the West Virginia Rules of Evidence. (*Id.*). The WVSC based this holding on its determination that the defense had attacked the credibility of Ms. Creathers during opening statements by indicating that defense witnesses would reveal "what really happened" that night. (*Id.*). Finally, the WVSC found that the fact that Ms. Quinn and Ms. Creathers's testimony conflicted in some respects did not establish that the State had knowingly employed false testimony to obtain Jeffery's convictions. (*Id.* at 4-5).

Jeffery submitted a petition for habeas corpus relief in August 2015 in the Circuit Court. (ECF No. 10-28 at 2). Mathew Victor was appointed to represent Jeffery in his habeas proceedings, and Mr. Victor subsequently submitted an amended habeas petition on April 29, 2016. (ECF No. 10-13 at 29). In the petition, Jeffery argued he was entitled to relief based on the following grounds:

1. [Jeffery] received ineffective assistance of counsel;

2. [Jeffery] was deprived his due process rights to a fair trial when the Trial Court engaged in an *ex parte* communication with a juror;

3. Under the plain error analysis, [Jeffery] was deprived [of] his due process rights to a fair trial when: (a) [Jeffery] was absent from critical stages of the proceedings; and (b) the Trial Court failed to swear in a witness for a large part of the witness' testimony;

4. Under the plain error analysis, the Trial Court erred in admitting evidence seized from [Jeffery]'s hotel room, vehicle, and residence;

5. Under the plain error analysis, the Trial Court erred in allowing the State of West Virginia to bolster its witness' testimony;

6. Under the plain error analysis, the Trial Court committed three (3) evidentiary errors: (a) allowed the testimony by a witness who did not have personal knowledge of the preparation of the tape of the 9-1-1 call played to the jury; (b) permitted witness reference to [Jeffery]'s alleged prior drug dealing; and (c) allowed references to bloody clothes in the hotel room although no bloody clothes [were] ever brought before the jury; …

7. The cumulative error[s] in the Trial Court proceedings deprived [Jeffery] of his due process right to a fair trial.

(ECF No. 10-13 at 5-6). Jeffery raised a number of sub-claims under the ground that he

was deprived of effective assistance of counsel. Specifically, Jeffery argued that:

1. Counsel failed to seek suppression of incriminating evidence seized during warrantless searches of Jeffery's motel room, vehicle, and residence. (*Id.* at 7);

2. Counsel failed to secure a diminished capacity, competency, or criminal responsibility examination despite evidence of drug use and mental health issues. (*Id.* at 7-8);

3. Counsel failed to follow up on a motion requesting the appointment of co-counsel. (*Id.* at 9);

4. Counsel failed to impeach Ms. Quinn by cross-examining her regarding the injuries she claimed to have suffered. (*Id.* at 9-10);

5. Counsel indicated he would present an alibi defense yet failed to pursue it. (*Id.* at 10);

6. Counsel failed to secure surveillance tapes from Mr. Woolwine's house or

the motel. (*Id.*);

7. Counsel allowed numerous bench conferences to take place without the presence of Jeffery and failed to challenge *ex parte* communications between a juror and the Circuit Court. (*Id.* at 11);

8. Counsel failed to produce promised witnesses and medical records. (*Id.* at 11-12);

9. Counsel failed to object to the State's "blatant bolstering" of Ms. Creathers' credibility. (*Id.* at 12);

10. Counsel failed to object to testimony and evidence regarding Jeffery's drug use and dealing. (*Id.* at 12-13);

11. Counsel failed to object to references to bloody clothes which were never presented to the jury. (*Id.* at 13);

12. Counsel failed to make a hearsay objection to a recorded 911 call. (*Id.*);

13. Counsel failed to properly impeach a witness with pending burglary charges. (*Id.*).

On June 16, 2016, the State submitted a Response, arguing that Jeffery's conviction should be upheld. (ECF No. 10-15). The Circuit Court held an evidentiary hearing on the habeas petition on November 7, 2016. (ECF No. 10-26 at 2). At the hearing, Jeffery took the stand to testify on his own behalf under questioning from his habeas attorney. (*Id.* at 9). Jeffery testified that he was "bipolar, manic depressive, paranoid schizophrenic, homicidal, [and] suicidal," and that he suffered from these conditions during the commission of the offenses and at trial. (*Id.* at 13-14). Jeffery asserted that he requested Mr. Bayliss arrange a mental health evaluation, and that he was later evaluated by a State expert, but never one of his own choosing. (*Id.* at 14-15). Jeffery asserted that he had identified a number of witnesses who would assist in his defense, but that Mr. Bayliss failed to secure those witnesses for trial. (*Id.* at 18-21). Jeffery stated that Mr. Bayliss never consulted him regarding his absences at bench conferences. (*Id.* at 23-24).

Jeffery testified that Mr. Bayliss failed to obtain surveillance video from an Exxon gas station, which would have revealed "what time I picked [Ms. Quinn] up, what time I brought her back, and what time we left the second time." (ECF No. 10-26 at 28-29). Jeffery explained that Mr. Bayliss also disregarded Jeffery's wish to have the bloody jeans introduced at trial. Jeffery believed these jeans "could show where the blood was, they would see that the blood was up around my knee area where she laid her hand." (*Id.* at 30). Jeffery surmised that demonstrating that the blood on his jeans was caused by Ms. Quinn placing her bloody hand on his knee would present exculpatory evidence, because it would reveal the bloodstains were not on his pants-leg as would be expected if he kicked Ms. Quinn repeatedly. (*Id.*). Jeffery also faulted Mr. Bayliss for failing to obtain photographs showing his trailer had been burglarized. (*Id.* at 31-32).

On cross-examination, Jeffery admitted that he was examined by a psychiatrist, but explained that the evaluation was cut short when Jeffery, following the advice of his attorney, refused to discuss the criminal case with the psychiatrist. (*Id.* at 40-41). On re-direct examination, Jeffery clarified that the psychological evaluation consisted of a number of questions and various diagnostic tests and tasks which Jeffery completed. However, when the State expert asked him about the case, and Jeffery refused to discuss his pending charges, the State expert declared the evaluation over. (ECF No. 10-26 at 54-55).

The proceedings were then continued until December 6, 2016, at which point Mr. Bayliss was called to testify. (*Id.* at 59-64). Mr. Bayliss explained that he enlisted the services of a private investigator in an attempt to locate witnesses. (*Id.* at 65). Mr. Bayliss and the investigator met multiple times with Jeffery in preparation for the trial. (*Id.* at 65-66). Mr. Bayliss explained that he felt it would have been "a waste of time" to request

a second competency evaluation following the evaluation conducted by the State. (*Id.* at 66).

Mr. Bayliss asserted that the decision not to enter medical records into evidence to impeach Ms. Quinn's testimony was "strategic" in that he did not wish to "aid the State in corroborating their theory." (*Id.* at 70). Mr. Bayliss believed that, as the burden of proof was on the State, the better strategy was to point to the complete lack of supporting medical evidence offered by the State as a fundamental weakness in the case. (*Id.*). Mr. Bayliss stated that he investigated the viability of every witness provided by Jeffery. (ECF No. 10-26 at 71). However, "the results were generally the same with each one, the testimony was unfavorable, uncorroborated or they just couldn't find these persons." (*Id.*). Mr. Bayliss was "doubtful" that surveillance tapes mentioned by Jeffery both existed and were exculpatory, but did not specifically recall discussing surveillance tapes prior to trial. (*Id.* at 72).

On cross examination, Mr. Bayliss further explained his difficulty in finding exculpatory witnesses, stating that he had two witnesses present at trial under a subpoena, however, immediately prior to testifying, the witnesses disavowed their earlier exculpatory statements, and indicated to Mr. Bayliss that they were unwilling to provide those statements under oath and in court. (*Id.* at 81). Mr. Bayliss believed that made those witnesses "essentially unavailable at that point." (*Id.*). Specifically, with regard to Mr. Woolwine, identified as a potential witness by Jeffery, Mr. Woolwine's attorney informed Mr. Bayliss that Mr. Woolwine was facing federal firearm charges and would invoke his constitutional right to remain silent if called to testify. (ECF No. 10-26 at 84-85). Mr. Bayliss explained that with regard to the other witnesses "there was nothing there" as the testimony would have failed to corroborate Jeffery's version of events. (*Id.* at 81-82).

On February 13, 2017, the Circuit Court entered an order denying Jeffery's habeas petition. (ECF No. 10-16).[2] Jeffery filed a brief appealing this decision to the WVSC on June 9, 2017. (ECF No. 10-18). The state submitted a response on August 23, 2017. (ECF No. 10-19). On October 15, 2018, the WVSC issued an opinion denying Jeffery's appeal of the Circuit Court's decision. (ECF No. 10-20). The WVSC found that at Jeffery's arguments based on plain error were unavailing as "[n]one of the alleged errors argued by [Jeffery] affected the fairness, integrity, or public reputation of the judicial proceedings and did not result in a miscarriage of justice." (*Id.* at 5). The WVSC further concluded that because the Circuit Court order "includes well-reasoned findings and conclusions as to the assignments of error now raised on appeal," the WVSC would adopt and incorporate the Circuit Court's findings of fact and conclusions of law. (*Id.*). The mandate finalizing the WVSC opinion was entered November 15, 2018. (ECF No. 10-21).

Jeffery filed the instant § 2254 petition on January 11, 2019. (ECF No. 2 at 15). In the petition, Jeffery asserts the following grounds for relief:

1. [Jeffery]'s due process rights under the Sixth Amendment to the United States Constitution were violated when his attorney provided ineffective assistance of counsel [when:]

    A. Trial counsel failed to move to suppress evidence seized from the motel room, [Jeffery]'s truck and/or residence;

    B. Trial counsel failed to obtain a pre-trial evaluation for competency or criminal responsibility;

    C. Trial counsel failed to effectively cross-examine the victim;

    D. Trial counsel failed to obtain surveillance tapes of the motel property;

    E. Trial counsel failed to include [Jeffery] in bench conferences;

---

[2] Given the number of arguments, and extensive analysis contained in these arguments, the opinion denying Jeffery's habeas petition will be discussed in full when analyzing Jeffery's substantive claims for relief.

F. Trial counsel failed to present a promised defense;

G. Trial counsel failed to object to "bolstering" of the co-defendant;

H. Trial counsel failed to object to [(a)] testimony regarding drug dealing [and (b)] testimonial references to bloody clothing;

I. Trial counsel failed to effectively cross-examine other witnesses;

J. Trial counsel failed to object to the 911 call;

2. [Jeffery] was deprived of his United States constitutional Due Process rights to a fair trial when the trial court engaged in an ex-parte communication with a juror;

3. [Jeffery] was deprived of his United States constitutional Due Process rights to a fair trial under the plain error analysis when: (a) [Jeffery] was absent from critical stages of the proceedings; and (b) the trial court failed to swear in a witness for a large part of the witness['] testimony;

4. [Jeffery] was deprived of his United States constitutional Due Process rights to a fair trial under the plain error analysis when the trial court erred in admitting evidence seized from [Jeffery]'s hotel room, vehicle, and residence;

5. [Jeffery] was deprived of his United States constitutional Due Process rights to a fair trial under the plain error analysis when the trial court erred in allowing the State of West Virginia to bolster its witness' testimony;

6. [Jeffery] was deprived of his United States constitutional Due Process rights to a fair trial under the plain error analysis when the trial court allowed the testimony by a witness who did not have personal knowledge of the preparation of the tape of the 9-1-1 call played to the jury;

7. The cumulative error in the trial court proceedings deprived [Jeffery] of his United States constitutional Due Process rights to a fair trial.

(ECF No. 2 at 4-19).

On May 3, 2019, Respondent submitted a Response to Jeffery's § 2254 petition, (ECF No. 10), accompanied by a Motion for Summary Judgment and supporting Memorandum of Law. (ECF Nos. 11, 14). Respondent argues that none of the claims raised by Jeffery entitle him to relief. (ECF No. 14 at 1). Specifically, Respondent contends that

the state courts correctly determined that none of Jeffery's claims of ineffective assistance of counsel rose to the level of a constitutional deprivation. (*Id.* at 13-20). Respondent further contends that Jeffery's claims raised in grounds 2, 3, 4, and 6 are procedurally barred because they were presumptively waived by Jeffery's failure to raise them on direct appeal. (*Id.* at 20). Respondent asserts that the state courts' determination that these claims were waived operates as an "independent and adequate state ground," sufficient to bar federal habeas review of these claims. (*Id.*). As to Jeffery's claim in ground 5, that the State allowed Ms. Creathers to improperly bolster her credibility, Respondent argues that as the state courts did not err in dismissing this claim on state evidentiary grounds, "it does not rise to the level of a constitutional challenge for purposes of federal collateral review." (*Id.* at 21). Finally, Respondent urges this Court to dismiss Jeffery's claim of cumulative error due to the fact that he fails to identify any "actual" errors. (*Id.* at 21-22).

Jeffery submitted a Response and Objection to Respondent's Motion for Summary Judgment on July 9, 2019. (ECF No. 16). Jeffery disputes Respondent's contentions and argues that Respondent's arguments in favor of dismissal are "erroneous at best[,] or knowingly deceptive at worst." (*Id.* at 4). Jeffery contests at length Respondent's characterization of the record and the legal viability of his various claims, arguing that the state courts committed significant errors in denying his habeas petition. (*Id.* at 7-14). Jeffery additionally argues that his claims raised in grounds 2, 3, 4, and 6 are not procedurally barred, as the state courts addressed the merits of the claims and, contrary to Respondent's assertion, did not find the claims waived. (*Id.* at 14-15). Jeffery argues that the state courts' determination that any alleged bolstering of Ms. Creathers testimony was permissible due to defense counsel's attack on her credibility was "simply erroneous." (*Id.* at 15). Finally, Jeffery argues he is entitled to relief based on the doctrine of

cumulative error. (*Id.* at 17-18). Jeffery asks this Court to deny Respondent's motion for summary judgment and reverse his conviction. (*Id.* at 18).

## II.    <u>Standards of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker*, 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The

"contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams*, 529 U.S. at 405) (internal quotations omitted). The district court may grant a habeas writ under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300–01 (internal marks omitted). Accordingly, the AEDPA limits the federal habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent moves for summary judgment. (ECF No. 11). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). The court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party

against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party, as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249–50).

### III.  **Discussion**

As noted above, Jeffery's § 2254 petition ostensibly asserts seven grounds for relief, with his claim of ineffective assistance of counsel consisting of ten sub-claims. A number of Jeffery's grounds for relief contain multiple independent claims. These claims will all be considered in turn. As many of the ineffective assistance of counsel claims are closely related to Jeffery's other foundational grounds for relief, the undersigned will first consider those grounds.

### A. Improper *Ex parte* Communication with a Juror

Jeffery asserts that his constitutional due process rights were violated when the Circuit Court conducted an *ex parte* conversation with a juror. (ECF No. 2 at 7-8). The state courts noted that Jeffery could have, but failed to, raise this issue on appeal and thus presumably waived the issue. (ECF No. 10-16 at 18). The state courts went on to address the issue on the merits, however, and determined that Jeffery's constitutional rights were not violated by the Circuit Court's procedures. (*Id.* at 18-19). The state courts first concluded that the conversation and subsequent bench conference were "not a critical stage in the proceedings." (*Id.* at 19). The state courts further determined that even if the conversation and conference were assumed to be critical stages of the proceedings, Jeffery had failed to demonstrate any prejudice resulting from his absence; thus, rendering his claim invalid. (*Id.* at 19-20).

"The Confrontation Clause of the Sixth Amendment and the Due Process Clause of the Fifth Amendment together guarantee the right of federal defendants charged with felonies to be present at all critical stages of their trials." *United States v. Tipton*, 90 F.3d 861, 872 (4th Cir. 1996). Nonetheless, the "right to presence at all critical stages of trial, though obviously important, is not ... an absolute, systemic right." *Id.*; *see also Rushen v.*

*Spain*, 464 U.S. 114, 117 (1983) (right to be present at trial subject to harmless error review) (*per curiam*). Rather, the defendant's right to be present extends "only 'to the extent that a fair and just hearing would be thwarted by [the defendant's] absence.'" *United States v. Gonzales-Flores*, 701 F.3d 112, 118 (4th Cir. 2012) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). Consequently, "[i]f a defendant is denied his right to be present during a critical stage, the error is considered harmless unless the defendant can offer a specific showing of prejudice." *Musgrove v. United States*, No. 2:11-CR-16-11, 2017 WL 9517118, at *8 (N.D.W. Va. Mar. 13, 2017), *report and recommendation adopted*, No. 2:11-CR-16-11, 2017 WL 3085054 (N.D.W. Va. July 20, 2017), *appeal dismissed*, 710 F. App'x 155 (4th Cir. 2018).

Here, after Juror Hogan informed the Circuit Court regarding her potential familial ties with Ms. Quinn, the Circuit Court informed the parties of the substance of the conversation and gave them the opportunity to question the juror. (ECF No. 20-4 at 16). Mr. Bayliss availed himself of this opportunity, asking Juror Hogan, "there is nothing in this that would cause you to not be able to fairly consider the evidence that's -in front of you?" Juror Hogan answered "[n]o, there is not." (*Id.* at 16-17). The precise nature of Juror Hogan's potential familial relationship to Ms. Quinn is not apparent from the transcript; however, it is clear that, if it existed, it was an attenuated relationship, based on a common relative through Juror Hogan's daughter-in-law. (*Id.* at 9-10). Juror Hogan gave no indication that she herself had any personal knowledge of or relationship with Ms. Quinn based on this potential familial relationship. (*Id.*).

The undersigned **FINDS** that the state courts' conclusion that the conversation between the Circuit Court and the juror, and the related bench conference with counsel, were not critical stages of the proceedings was not contrary to, or an unreasonable

application of, federal law. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) ("The mere occurrence of an *ex parte* conversation between a trial judge and a juror does not constitute a deprivation of any constitutional right.") (quotation and alteration omitted) (*per curiam*); *see also United States v. Peterson,* 385 F.3d 127, 138 (2d Cir. 2004) *("* In sum, [the judge's] private, on the record meeting with juror number three, followed by reading and discussing the transcript of that meeting with defense counsel, was neither a due process violation nor a violation of Federal Rule of Criminal Procedure 43[.]"); *United States v. Bertoli*, 40 F.3d 1384, 1397 (3d Cir. 1994) ("[I]n the absence of some special circumstance, it is clear that there is no constitutional right for a defendant to be present at a conference in chambers concerning dismissal of a juror.") (alterations and quotation omitted); *United States v. Fernandez-Hernandez*, 652 F.3d 56, 65 (1st Cir. 2011) (no constitutional violation when judge informed defense counsel of concerns regarding witness impartiality and parties questioned jurors in absence of defendant). Moreover, even assuming the state courts erred in holding that the conversation and bench conference were not critical stages of the trial, Jeffery has failed to show the state courts erred in concluding that his absence at these proceedings "was harmless beyond all reasonable doubt." (ECF No. 10-16 at 19). The state courts noted that following the Circuit Court's conversation with the juror, counsel was given, and took advantage of, the opportunity to question the juror about her connection to Ms. Quinn. (*Id.*). The state courts further noted that Jeffery did "not even argue how he was harmed by his absence save for the conclusory statement that his right to a fair trial was affected." (*Id.* at 20).

As noted by the state courts, once the juror disclosed her potential familial connection to Ms. Quinn, the Circuit Court apprised defense counsel of the disclosure and gave counsel the opportunity to question the juror. Jeffery has not articulated, either

before the state courts or in his federal pleadings, how the procedure adopted by the Circuit Court affected his right to a fair trial. Jeffery contends that he was not given the chance to "voice his concerns or opinions" regarding the juror's disclosure, but does not indicate the basis of those concerns. (ECF No. 2 at 10). Although the juror disclosed that she might have a distant relative in common with Ms. Quinn, the juror gave no indication that she knew Ms. Quinn personally or had specific knowledge about Ms. Quinn. Furthermore, the existence of a familial connection between the juror and Ms. Quinn cannot be presumed to have been prejudicial to Jeffery. As is demonstrated by the testimony of Ms. Quinn's cousin, Terry Campbell, and the actions of Ms. Quinn's uncle and stepfather on the night of her attack, the familial relationship is not *per se* beneficial.

Therefore, the undersigned **FINDS** that the state courts' conclusion that Jeffery failed to show prejudice based on his absence from either the *ex parte* conversation, or the subsequent bench conference, was not contrary to, or an unreasonable application of, clearly established federal law. *See Rushen,* 464 U.S. at 119 (disclosure by trial court of any *ex parte* discussion with a juror is generally an adequate remedy); *see also United States v. Mann,* 685 F.3d 714, 721 (8th Cir. 2012) ("Here, the district court informed the parties and their counsel in open court of the contents of his *ex parte* communication shortly after it occurred, and *Rushen* therefore does not require us to order an evidentiary hearing."); *Blakeney v. Lee,* No. 3:05 CV-10-V, 2007 WL 1341456, at *58 (W.D.N.C. May 3, 2007), *aff'd sub nom. Blakeney v. Branker*, 314 F. App'x 572 (4th Cir. 2009)( "[The petitioner] has cited no clearly established Federal law entitling him to be present at a bench conference [discussing juror selection] at which he was represented by counsel and that did not implicate his confrontation rights or create a situation where his presence would have had a reasonably substantial relation to his opportunity to defend against the

charges against him."); *United States v. Patterson*, 587 F. App'x 878, 884 (6th Cir. 2014) (*ex parte* communications between judge and jury were harmless where conversation was disclosed to defense counsel and did not relate to substantive issues of guilt or innocence); *Rowe v. Painter*, No. CIV.A. 3:00-0359, 2001 WL 34554178, at *1 (S.D.W. Va. Mar. 27, 2001), *dismissed*, 21 F. App'x 238 (4th Cir. 2001) (the petitioner was not deprived of his right to be present at critical stages of trial by his absence from several bench conferences discussing various issues including alternate juror selection). Therefore, this claim is without merit.

### B. Absence from other critical stages of the proceedings

Jeffery argues that his due process rights to a fair trial were violated when he was absent from several "critical stages" of the trial. (ECF No. 2 at 9). In support of this claim, Jeffery asserts that, in addition to his exclusion from the discussion regarding Juror Hogan's disclosure, he was absent from several bench conferences. (*Id.* at 10). The state courts disposed of this argument, finding that Jeffery "had failed to demonstrate that he was in any way prejudiced by his absence from some conferences at which routine scheduling matters were discussed." (ECF No. 10-16 at 20).

While the state courts' disposal of this claim is brief, the deference due the holding is not altered. When a state court has summarily denied a habeas claim, that decision can only be overturned if the petitioner shows that "there was no reasonable basis" for the state court's decision. *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 98, (2011)). Jeffery has failed to show that the state courts erred in finding no evidence of prejudice stemming from his absence at bench conferences. Mr. Bayliss testified at the habeas hearing that, to his recollection, Jeffery was not present at the bench conferences, because they were only discussing logistical issues that were

incidental to the trial. (ECF No. 10-26 at 82).

The undersigned has already determined that the state courts did not err in finding a lack of prejudice from the *ex parte* communication and bench conference involving Juror Hogan. Other bench conferences at which Jeffery was not present included a discussion regarding the propriety of defense counsel's questioning of a witness, (ECF No. 20-2 at 63), the unavailability of a defense witness, (ECF No. 20-3 at 8-9, 108), a motion to exclude potentially prejudicial testimony, (*Id.* at 7-8), the inclusion of a lesser included offense instruction, (ECF No. 20-4 at 3-7), and the issue of the jury being permitted to bring jury instructions into the deliberation room. (ECF No. 20-4 at 108-09). Jeffery does not specifically identify how his absence from any of these conferences prejudiced him, and there is no prejudice apparent from the record.

As to the bench conference involving defense counsel's questioning of a witness, Mr. Bayliss ably argued that he should be entitled to question Ms. Quinn regarding her relationship with Scott Nunley. (ECF No. 20-2 at 63-64). The Circuit Court, however, sustained the State's objection to the testimony. (*Id.* at 64). Jeffery does not attempt to describe how his presence at this bench conference would have altered the Circuit Court's decision, much less have had an appreciable impact on the trial. As to the discussion regarding a continuance due to the illness and unavailability of a defense witness, that witness recovered and was able to testify at trial. (ECF No. 20-4 at 18). Accordingly, Jeffery is clearly unable to show any prejudice resulting from his absence at this discussion.

Jeffery likewise makes no attempt to show how he was prejudiced by the parties' decision to allow the jury to take the instructions into the deliberation room. Jeffery does not assert that he would have discouraged his attorney from agreeing to this course, nor

does he indicate how a different decision regarding the instructions would have benefited him. Similarly, Jeffery offers no argument as to how he was harmed by not being present at the discussion regarding the submission of lesser included offenses. (ECF No. 20-4 at 3-5). As his attorney successfully argued that Jeffery was entitled to an instruction regarding the lesser included offense of second-degree robbery—an argument that resulted in Jeffery receiving a lighter sentence—Jeffery is unable to convincingly argue that he was harmed by his absence at this conference. Finally, Mr. Bayliss moved to exclude testimony regarding Jeffery's involvement with the disappearance of Melanie Metheny during another bench conference not attended by Jeffery. (ECF No. 20-3 at 7). However, the record makes clear that this motion was fully discussed with Jeffery and made with his consent. (*Id.* at 7-8). Jeffery does not make any representation that the record is incorrect or that he did not, in fact, discuss this issue fully with his attorney.

Given the largely incidental nature of the issues discussed in the other bench conferences where Jeffery was absent, the undersigned **FINDS** that the state courts' determination that Jeffery failed to demonstrate any prejudice stemming from his absence at these conferences was not contrary to, or an unreasonable application of, clearly established federal law. *See Sprinkle v. Warden, Maryland House of Correction,* 828 F.2d 17 (4th Cir. 1987) (no error when defendant was not present during *voir dire* as counsel was present and able to represent defendant); *Flippen v. Polk,* No. 1:01CV00674, 2004 WL 1348220, at *25 (M.D.N.C. June 8, 2004) "[The petitioner] fails to allege how he was prejudiced by his absence at bench conferences and certain pre-trial conferences."); *see also Musgrove*, No. 2:11-CR-16-11, 2017 WL 9517118, at *8 (finding the petitioner failed to show prejudice stemming from his absence at bench conference where "counsel was present during the bench conference to represent [the petitioner's]

interests."); *Rowe*, No. CIV.A. 3:00-0359, 2001 WL 34554178, at *1 (denying claim based on absence from bench conferences where the petitioner was unable to show prejudice due to absence). Consequently, this ground for habeas relief is unpersuasive.

### C. Failure to swear in witness

Jeffery asserts that his due process rights to a fair trial were violated when a witness was not sworn in for a portion of her testimony. (ECF No. 2 at 10). The state courts dismissed this claim, finding that the procedure adopted by the Circuit Court when it became apparent Ms. Creathers had not been sworn in was appropriate and adequately protected Jeffery's constitutional rights. (ECF No. 10-16 at 20-21).

After Ms. Creathers had begun testifying, proceedings were paused for a bench conference wherein the prosecutor informed the Circuit Court that Ms. Creathers had inadvertently not been sworn in. (ECF No. 20-3 at 41). When the trial resumed, Ms. Creathers was sworn in. (*Id.* at 54). The Circuit Court then asked Ms. Creathers, now under oath, if all her previous testimony had "been honest and truthful." (*Id.* at 54). Ms. Creathers affirmed that it had been, and asserted that she would not change her answers to any previous questions if asked again, under oath. (*Id.*).

Under West Virginia evidentiary rules, "[b]efore testifying, a witness must give an oath or affirmation to testify truthfully." W. Va. R. Evid. 603. The oath "must be in a form designed to impress that duty on the witness's conscience." *Id.* "It is generally required that witnesses be sworn before they are permitted to testify." *In re Simmons Children*, 154 W. Va. 491, 496 (1970). "However, the admission of unsworn testimony is a mere irregularity and not a jurisdictional defect, and a party should object at the proper time in order to have the witness sworn and such irregularity may be waived by the failure to object." *Id.* The irregularity may also be corrected by having the witness sworn in. *Id.* "It

43

is the duty of the party calling the witness to see that he is sworn; though, if the oath is inadvertently omitted, the objection will not be good after verdict." *State v. Williams*, 38 S.E. 495, 496 (1901).

The same is true in federal court. The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has likewise held that "[i]t is well settled that the swearing of a witness is waived by failure to raise the point during the witness' testimony, thus denying the trial court an opportunity to correct what has been characterized as an 'irregularity.'" *United States v. Odom*, 736 F.2d 104, 114 (4th Cir. 1984); *see also United States v. Babul*, 476 F.3d 498, 500 (7th Cir. 2007) (defendant waived objection to unsworn testimony when counsel declined to call witness back to stand after learning the oath had inadvertently been overlooked); *United States v. Perez*, 651 F.2d 268, 273 (5th Cir.1981) ("It has long been the general rule that even a failure to swear a witness may be waived. This may occur either by knowing silence and an attempt to raise objection after verdict or by the mere failure of counsel to notice the omission before completion of the trial.").

The state courts dismissed this claim applying state law. (ECF No. 10-16 at 20-21). Jeffery has not identified any federal rule or right that was violated by the state courts' decision. Indeed, the state courts' conclusion that the procedures adopted by the Circuit Court were adequate, and Jeffery's claim to the contrary was unavailing, is in accordance with federal law addressing the same issue. The Circuit Court corrected the issue by swearing Ms. Creathers in and having her, under oath, reaffirm her prior statements. Jeffery did not object to this procedure. Accordingly, under both West Virginia state law, as well as federal law, he waived any objection to the unsworn testimony. As the state courts' dismissal of this claim was not an unreasonable application of, or contrary to, federal law, the undersigned **FINDS** no merit to this claim.

### D. Trial Court erred in admitting evidence seized unlawfully

Jeffery asserts that he was deprived of his constitutional due process rights to a fair trial when evidence that was seized in violation of the Fourth Amendment to the United States Constitution ("Fourth Amendment") was admitted into evidence. (ECF No. 2 at 11). In support of this argument, Jeffery asserts that law enforcement officials used a falsified concern that evidence would be tampered with as an "excuse" to search his motel room and truck without a warrant. (*Id.* at 11-12). The fruits of these searches were then erroneously admitted at trial without objection by defense counsel. (*Id.* at 4, 11-12).

In considering this claim, the Circuit Court determined that the evidence was not improperly admitted for several reasons. First, the Circuit Court noted that testimony at trial revealed Jeffery voluntarily let police officers into his motel room. (ECF No. 10-16 at 21). Additionally, the Circuit Court found that Trooper Ward's entry into the motel room was not unconstitutional as it was excused by the "emergency" exception to the general warrant requirement. (*Id.*). The Circuit Court stated that Trooper Ward entered the room in an attempt to locate Ms. Quinn, a suspected kidnapping victim, whom he feared might be injured or in need of assistance. (*Id.* at 21-22). The Circuit Court also noted that testimony at the habeas hearing tended to establish that Jeffery did not own the truck, nor personally rent the motel room, and accordingly lacked standing to challenge the allegedly unconstitutional search. (*Id.* at 22). Finally, the Circuit Court indicated that the seized items were actually beneficial to Jeffery's defense as DNA results obtained from the items did not reveal any positive results for Jeffery and supported his theory that he was "merely present" for the events while Ms. Creathers was the primary perpetrator. (*Id.*). These findings were adopted by the WVSC.

Respondent focuses on the "emergency doctrine" aspect of the state courts'

decision, arguing that the courts' finding is supported by the record and should not be overturned. (ECF No. 14 at 13-14). Jeffery disparages the use of this reasoning to uphold the state courts' determination, contending that the Circuit Court only mentioned the doctrine "in passing," and placed more reliance on the "false premise" that Jeffery invited the police officers into the motel room. (ECF No. 16 at 8-9).

The Fourth Amendment provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court of the United States ("Supreme Court") has recognized that "a warrant must generally be secured" and "[i]t is a basic principle of Fourth Amendment law, ... that searches and seizures inside a home without a warrant are presumptively unreasonable." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quotation omitted). A violation of the Fourth Amendment's proscription against unreasonable searches generally is remedied by "the exclusionary rule—the rule that often requires trial courts to exclude unlawfully seized evidence in a criminal trial— ... the principal judicial remedy to deter Fourth Amendment violations." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). "[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and, ... 'evidence later discovered and found to be derivative of an illegality, the so-called "fruit of the poisonous tree."'" *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

While there is a general presumption that warrantless searches are unreasonable, "this presumption may be overcome in some circumstances because 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *King,* 563 U.S. at 459 (quoting *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006)). The Supreme Court has identified a number of circumstances wherein the presumptive unreasonableness of a

warrantless search is overcome. One such "exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U.S. at 403 (quotation omitted). Under this exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id.* Whether or not a warrantless entry is excused under the aegis of this exception is determined by an objective test which measures whether the circumstances, viewed objectively, justified the entry. *Id.* at 404.

The state courts' determination that Trooper Ward's search of the truck and motel room did not violate the Fourth Amendment was not unreasonable. Trooper Ward testified at trial that when he arrived at the Knights Inn motel, Ms. Quinn, at that time believed to be a victim of a kidnapping, had not yet been found. (ECF No. 20-2 at 124). Charleston police officers were already present at the scene and had secured Jeffery in a chair outside of his motel room. (*Id.* at 122-123). Upon arriving at the motel, Trooper Ward was informed that the victim had been harmed by being stabbed or cut in some manner. (*Id.* at 122). Trooper Ward testified that he entered the motel room, accompanied by Charleston police officers, to discover if Ms. Quinn was inside, because he was concerned that she might be in need of assistance. (*Id.* at 124-25). Trooper Ward also opened the door of the black Dodge Ram truck, which had previously been identified as the vehicle involved in the kidnapping, and looked inside in search of Ms. Quinn. (*Id.* at 127). Trooper Ward stated that based on what he witnessed in the motel room, he instructed Charleston police officers to obtain a search warrant. Trooper Ward explained that Jeffery's residence was also searched later that same day pursuant to a search warrant. (*Id.* at 128-29). In addition, Ms. Creathers testified that when police officers first

arrived at the motel, Jeffery gave them permission to enter the motel room and look for Ms. Quinn. (ECF No. 20-3 at 80-81).

The Fourth Circuit has upheld a warrantless search of a residence where police officers entered a home after responding to a 911 call reporting suspicious activity. *See Hunsberger v. Wood*, 570 F.3d 546 (4th Cir. 2009). In that case, the officers were informed by a neighbor, incorrectly as it was later revealed, that the owners of a house were out of town, but that there was nevertheless activity in the house. *Id.* at 550-52. The officers were also informed that a vehicle, belonging to a minor who was feared missing by her parents, was parked outside the house. *Id.* at 550-51. The Fourth Circuit determined that the officers' warrantless entry was not a violation of the Fourth Amendment because, under the emergency exception, both the officers' fear that the household was being vandalized or burglarized, and the officers' fear that a minor child may be in danger were reasonable under the circumstances. *Id.* at 555. The Fourth Circuit noted that while it was later revealed the minor child was not in fact in any danger, "[a]t the time of the search, there was reason to think she needed help." *Id.* The Fourth Circuit accordingly upheld the officers' warrantless entry finding it was reasonable to "conclude that prompt entry was necessary in order to protect the … home from potential damage and to locate a missing girl who might be in harm's way." *Id.*

Trooper Ward testified that when he arrived at the Knights Inn motel he was immediately informed, albeit in a garbled and somewhat confusing manner, that the kidnapping victim had been stabbed. (ECF No. 20-2 at 122). He was also told that a woman present at the scene, who was impersonating the victim, was responsible for kidnapping and harming the victim. (*Id.*). Under these circumstances, electing to immediately open the motel door in order to see if the victim was inside and in need of

assistance was reasonable. Likewise, opening the door of the truck for the same purpose was reasonable. Trooper Ward did not perform an extensive search of the motel or truck and the search was appropriately "limited by the type of emergency involved" and not used as a pretext to gather evidence or search for things unrelated to the emergency prompting entry. *See United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992).

Given that Trooper Ward searched the motel room and vehicle for Ms. Quinn when her whereabouts were still unknown, and "[a]t the time of the search, there was reason to think she needed help," *Hunsberger*, 570 F.3d at 555, the undersigned **FINDS** that the state courts' determination that the warrantless entry into these locations was performed pursuant to a valid exception was not objectively unreasonable nor contrary to federal law. Furthermore, counter to Jeffery's assertion, the state courts did not merely mention the emergency doctrine in "passing," but invoked the application of the emergency doctrine as a valid and independent reason why the Circuit Court did not err in admitting the evidence. (ECF No. 10-16 at 21-22). Therefore, this ground fails to justify habeas relief.

### E. Improper bolstering of testimony

Jeffery alleges that he was denied a fair trial when the Circuit Court improperly permitted the State to bolster the testimony of its own witnesses. (ECF No. 2 at 16). The WVSC considered Jeffery's improper bolstering claim on appeal and held that "[t]he record establishes that [Jeffery] attacked the co-defendant's character for truthfulness during opening statements by indicating his intention to call one of the co-defendant's jail mates to testify 'as to what really happened.'" (ECF No. 10-11 at 4). The WVSC thus concluded that the testimony in question did not violate Rule 608 of the West Virginia Rules of Evidence. (*Id.*). The state courts adopted this reasoning when denying Jeffery's similar claim in habeas. (ECF No. 10-16 at 17-18). Jeffery disputes that this explanation

provides a valid basis to excuse the error, arguing that "[o]pening statements are not evidence," and that the State acted improperly in bolstering Ms. Creathers' testimony. (ECF No. 16 at 13).

Jeffery challenges the state courts' determination that a state evidentiary rule was not violated. It is not "the province of a federal habeas court to reexamine state court determinations on state-law questions." *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991). When considering federal habeas corpus petitions involving state evidentiary rulings, federal courts "'do not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding.'" *Harper v. Ballard*, No. CIV.A. 2:13-7421, 2015 WL 1431164, at *21 (S.D.W. Va. Mar. 27, 2015) (quoting *Burket v. Angelone*, 208 F.3d 172, 186 (4th Cir.2000)). "It is only in circumstances impugning fundamental fairness or infringing specific constitutional protections that a federal question is presented." *Id.* (quoting *Spencer v. Murray*, 5 F.3d 758, 762 (4th Cir.1993)).

Jeffery has not identified any specific constitutional protection that was violated by this allegedly improper bolstering, nor did the testimony in question impugn the fundamental fairness of the trial. Jeffery objects to Ms. Creathers testimony at trial that she was testifying in order "to tell the truth." (ECF No. 20-3 at 17-18, 84). The Fourth Circuit has held that "it is error for the government to bolster or vouch for its own witnesses." *United States v. Lighty*, 616 F.3d 321, 359 (4th Cir. 2010). "Consequently, the prosecutor may not, among other things, make explicit personal assurances that a witness is trustworthy or implicitly bolster the witness by indicating that information not presented to the jury supports the testimony." *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir.1993). However, in this case, the prosecution did not make any personal

assurances that the witness was trustworthy, or suggest that evidence not presented to the jury supported her testimony. Instead it was the witness herself who twice testified that she wanted to tell the truth. This does not rise to the level of improper bolstering under federal law. *See United States v. Lighty,* 616 F.3d 321, 359 (4th Cir. 2010) (no improper bolstering or vouching where "[t]he AUSA neither gave personal assurances that [the petitioner] was trustworthy nor indicated that information not presented to the jury supported [the petitioner's] testimony."); *United States v. Henderson*, 717 F.2d 135, 138 (4th Cir. 1983) (no error where prosecution elicited testimony from witness that he had promised to be truthful).

In any event, even assuming Ms. Creathers testimony that she wanted to tell the truth did rise to the level of improper bolstering, the state courts' conclusion, made under state law, that the testimony was permissible due to the "attack" on Ms. Creathers' credibility made in opening statements did not deprive Jeffery of a fair trial. In opening statements, Mr. Bayliss indicated that the jury would realize "things aren't as they seem originally," and that the night in question involved "a situation of romantic involvement between both of these women with Mr. Jeffery." (ECF No. 20-2 at 10). Mr. Bayliss stated that the testimony of a witness would reveal that "what really happened" involved a "double cross" orchestrated by Ms. Creathers and Ms. Quinn. (*Id.* at 12-14).

The undersigned **FINDS** the state courts' conclusion in this regard was neither contrary to, nor an unreasonable application of, federal law. Under both federal and state law, when the credibility of a witness has been attacked by the defense, the government may attempt to rehabilitate the credibility of the witness via bolstering. *See United States v. Suarez-Milian*, 976 F.2d 728 (4th Cir. 1992) (not improper for government to bolster testimony after credibility of witness was attacked in opening arguments and throughout

trial) (unpublished); *see also United States v. Williams*, No. 18-1181, 2019 WL 4389136, at *2 (2d Cir. Sept. 13, 2019) ("Where an opening statement 'sufficiently implicates the credibility of a government witness,' we have held, 'testimonial evidence of bolstering … may be introduced for rehabilitative purposes during direct examination.'") (quoting *United States v. Gaind*, 31 F.3d 73, 78 (2d Cir. 1994)); *State v. King*, No. 14-0545, 2015 WL 1741394, at *6 (W. Va. Apr. 10, 2015) (bolstering allowed where defense attacked character of witness). Mr. Bayliss clearly indicated in opening statements that Ms. Creathers's testimony was not truthful and that she was lying in order to cover up "what really happened" on the night in question; namely, that she and Ms. Quinn were involved in an altercation based on their mutual romantic pursuit of Jeffery. (ECF No. 20-2 at 10-14). Accordingly, this ground for relief is unavailing.

### F. Admission of a recorded emergency call

Jeffery asserts that the Circuit Court erred in admitting recorded 911 calls when the audio recording were not authenticated by the person who actually prepared the copy of the recordings. (ECF No. 2 at 17). Jeffery contends that this erroneous admission violated the Confrontation Clause of the Sixth Amendment to the United States Constitution ("Sixth Amendment"). (*Id.* at 18). The state courts noted that this claim was presumptively waived by Jeffery's failure to raise it on appeal. (ECF No. 10-16 at 22-23). Nevertheless, the state courts went on to address the claim on the merits, albeit in a summary manner, holding that the evidence was not admitted in error. (*Id.* at 23). The state courts additionally determined that admission of the recorded calls were not an error of constitutional dimension because "[t]he 911 call was not testimonial in nature," and "[o]nly testimonial out of court statements are subject to the scrutiny of the confrontation clause." (*Id.* at 27). Jeffery does not challenge the state courts'

determination that the recorded calls were not testimonial in nature; rather, he challenges only its presentation by an employee who did not himself prepare the copy of the recordings.  (ECF No. 2 at 17).

The state courts resolved this question under state evidentiary rules. (ECF No. 10-16 at 23). The recorded calls were introduced pursuant to the regularly kept business record exception under West Virginia Rule of Evidence 803(6). (ECF No. 20-2 at 112-14). That rule requires the proponent of the evidence to show that the evidence is:

> (1) a memorandum, report, record, or data compilation, in any form; (2) concerning acts, events, conditions, opinions or diagnoses; (3) made at or near the time of the matters set forth; (4) by, or from information transmitted by, a person with knowledge of those matters; (5) that the record was kept in the course of a regularly conducted activity; and (6) that it was made by the regularly conducted activity as a regular practice.

*Crawford v. Snyder*, 228 W. Va. 304, 311–12 (2011) (quoting *Lacy v. CSX Transp., Inc.*, 205 W.Va. 630, 634 (1999)). "It is not essential to the admissibility of a business record that the clerk who actually made the record be called to testify." *Hill v. Joseph T. Ryerson & Son, Inc.*, 165 W. Va. 22, 42 (1980). Instead, "[t]he trustworthiness of the record entry is established by the testimony of a custodial or supervisory official if he can adequately demonstrate the regularity of the particular recordkeeping as an established procedure within the business routine." *Id.*

Jeffery does not explain how the admission of the recorded calls through the testimony of 911 employee, Mr. Phantom, violated any federal constitution rights. It is true that under federal evidentiary rules "[t]he proponent of an audio recording must show that the recording was sufficiently authentic to be admitted into evidence." *United States v. Wilson*, 115 F.3d 1185, 1188–89 (4th Cir. 1997) (citing *United States v. Branch*, 970 F.2d 1368, 1371 (4th Cir. 1992)). However, the requirement of authentication is

satisfied when there is "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). All that is required under Fourth Circuit precedent for the admissibility of recorded conversations is "some proof that the audio recording accurately reflects the conversation in question." *United States v. Spence*, 566 Fed.Appx. 240, 243 (4th Cir. 2014) (*per curiam*) (citing *United States v. Clark*, 986 F.2d 65, 68 (4th Cir. 1993). This "low threshold" may be met by the testimony of one who is familiar with the recordings or the process used to produce the recordings. *Id.* at 244.

"Courts routinely admit 911 tapes because, as public records they are ... self-authenticating as a certified business record." *Barnes v. Montgomery Cty., Maryland*, No. AW-09-CV-02507, 2012 WL 13012456, at *2 (D. Md. July 9, 2012); *see also United States v. Suggs*, 266 F. App'x 258, 262 (4th Cir. 2008) (recorded 911 call admissible under business records exception); *United States v. Harper*, No. 05-CR-6068L, 2009 WL 140125, at *2 (W.D.N.Y. Jan. 20, 2009) ("There does not seem to be any dispute here that the [recorded 911] printout itself meets the requirements for admission as a business record under Rule 803(6)."). As under West Virginia law, under the federal business records exception, "[i]t is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business." *United States v. Langford*, 647 F.3d 1309, 1327 (11th Cir. 2011) (quotation omitted).

The calls were introduced by Mr. Phantom, an administrator at Metro Communications, who testified that the recorded 911 calls in question were prepared in accordance with the procedures in place at Metro Communications. (ECF No. 20-2 at 111-12). Contrary to Jeffery's assertion, there is no federal rule mandating that non-

testimonial audio recordings may only be authenticated by an individual who personally prepared the recording in question. Additionally, it is well established under federal law that 911 calls may be admitted under the business records exception.

Of note, Jeffery does not challenge the state courts' finding that the recorded calls was non-testimonial in nature. While the Supreme Court has held that *testimonial* evidence must be presented by one who actually prepared the report or analysis, reports, records, and other evidence that are non-testimonial in nature may be admitted pursuant to the less stringent requirements of the business records exception. *See Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 321, (2009); *see also Barthelemy v. Cain*, 639 F. App'x 225, 227 (5th Cir. 2016) (testimony offered by 911 operator authenticating 911 call did not fall under ambit of confrontation clause where 911 call was non-testimonial).

 Accordingly, the undersigned **FINDS** that the authentication and introduction of the recorded 911 calls by Mr. Phantom did not violate any federal rule, much less one of constitutional significance; therefore, the state courts' acceptance of the evidence was neither an unreasonable application, nor contrary to, clearly established federal law.

### G. Ineffective Assistance of Counsel

The Sixth Amendment guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor*, 535 U.S. 162, 166 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different. *Strickland*, 466 U.S. at 687–88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

As Jeffery is raising his claims of ineffective assistance of counsel in a § 2254 petition, his claims must overcome both the *Strickland* standard, and the barrier imposed by § 2254(d), resulting in review that is "doubly" deferential to the decision of the state court. *Knowles v. Mirzayance*, 556 U.S. 111, 129 (2009). In *Harrington v. Richter*, the Supreme Court made clear that relief in these circumstances should be granted only sparingly. 562 U.S. 86, 102 (2011). In *Harrington,* the Supreme Court reviewed and reversed a decision by the Ninth Circuit to grant relief to a petitioner raising ineffective assistance of counsel claims in a § 2254 petition. *Id*. The *Harrington* Court clarified that the "pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Id*. at 101. A state court's determination that trial counsel was not defective cannot be overturned in federal habeas review unless "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. This standard of review recognizes

that for the "purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" *Id.* at 101 (quoting *Williams,* 529 U.S. at 410). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. Habeas review under § 2254(d) is intended to function as a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102-03.

Likewise, "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105. It is not enough that trial counsel's performance may have "deviated from best practices or most common custom" as "the question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms.'" *Strickland*, 466 U.S., at 690. Thus, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult," and "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington,* 562 U.S. at 102, 105. To succeed in establishing his claim of ineffective assistance of counsel, Jeffery must satisfy this demanding standard articulated by the Supreme Court.

### 1. Failure to move to suppress evidence

Jeffery argues that his attorney provided constitutionally deficient assistance by failing to file a motion to suppress evidence that was seized from the motel room and Dodge Ram truck in violation of the Fourth Amendment (ECF No. 2 at 5). The undersigned has already considered this issue in the context of Jeffery's claim that his constitutional rights were violated when the Circuit Court admitted that evidence. As the undersigned has determined that the state courts were not unreasonable in finding no

constitutional violation occurred in the seizure or admission of that evidence, their conclusion that Jeffery failed to show ineffective assistance of counsel premised on a failure to object to this evidence was neither unreasonable, nor contrary to federal law. (ECF No. 10-16 at 21). Accordingly, the undersigned **FINDS** that this claim is meritless.

### 2. Competency evaluation

Jeffery believes his attorney provided ineffective assistance of counsel by failing to secure a pre-trial competency or criminal responsibility evaluation despite his "long history of mental health problems combined with a pervasive drug addiction." (ECF No. 2 at 5). The state courts found this claim unavailing based on the fact that Jeffery's counsel requested and received a competency evaluation, which found him both criminally responsible and competent to stand trial. (ECF No. 10-16 at 23-24). Jeffery disputes the validity of this finding, asserting that his testimony at the evidentiary hearing established his refusal to participate in the competency evaluation in keeping with counsel's warning not to discuss the criminal case with anybody. (ECF No. 16 at 9).

It has long been a principle in American jurisprudence that "the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (quoting *Medina v. California,* 505 U.S. at 453 (1992); *Drope v. Missouri,* 420 U.S. at 171–72 (1975); *Pate v. Robinson,* 383 U.S. at 378 (1966)). The right of criminal defendants to be tried only if competent "is fundamental to an adversary system of justice." *Drope*, 420 U.S. at 172; s*ee also Riggins v. Nevada*, 504 U.S. 127, 139-140 (1996) (Kennedy, J., concurring) ("Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing

so.") (citation omitted). The test for competency to stand trial is well-established:

> [I]t is not enough for the district judge to find that the defendant is oriented to time and place and has some recollection of events, but that the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.

*Dusky v. United States*, 362 U.S. 402 (1960) (internal quotation marks and bracketing omitted). Simply stated, a defendant whose mental condition is such that he lacks the ability to assist in preparing his own defense may not be subjected to trial. *Drope,* 420 U.S. at 903.

The law is also well-settled that "[a]n attorney's duty, of course, does not mandate the exploration of the issues of sanity and/or competency in every instance." *Wood v. Zahradnick*, 430 F.Supp. 107, 111 (E.D.Va.1977), *aff'd*, 578 F.2d 980 (4th Cir. 1978). If "the facts known and available, or with minimal diligence accessible, to defense counsel raise a reasonable doubt as to a defendant's mental condition, [then] counsel has an affirmative obligation to make further inquiry" into the issue of competency. *Id.* Counsel "is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation." *Becton v. Barnett*, 920 F.2d 1190, 1192 (4th Cir. 1990).

The state courts determined that Jeffery's counsel did not provide deficient performance in declining to pursue a competency or criminal responsibility defense based on a State expert's evaluation which determined that Jeffery was mentally competent. Jeffery's criminal docket reveals that he underwent a forensic examination on September 24, 2013. (ECF No. 10-27 at 3). A sealed psychological evaluation was later produced. (*Id.*). At the habeas hearing, Jeffery admitted he was evaluated by a psychiatrist and was found competent to stand trial and criminally responsible. (ECF No. 10-26 at 40-41).

Jeffery contested the validity of that evaluation, however, asserting that it wasn't "much of an evaluation" because Jeffery refused to talk to the psychiatrist about his criminal case, prompting the psychiatrist to end the evaluation prematurely. (*Id.* at 42). Jeffery further explained that the evaluation consisted of a series of questions and tests, which Jeffery completed. However, following the tests he was seen by a doctor who asked him about the events surrounding the pending criminal case, and when Jeffery refused to discuss this, the doctor replied "[w]ell this is over then." (*Id.* at 55). Mr. Bayliss testified that he recalled requesting an evaluation for competency and criminal responsibility. (*Id.* at 66). Mr. Bayliss explained that after the results of the evaluation indicated that Jeffery was both competent and criminally responsible, Mr. Bayliss felt "it would have been a waste of time" to pursue a competency hearing. (*Id.*). Mr. Bayliss also asserted that he explored all possible defenses, including a defense based on diminished capacity, and determined that the circumstances of the crime did not warrant pursuing such a defense. (*Id.* at 66-67).

The state courts determined that, given the psychological evaluation finding Jeffery competent and criminally responsible, his attorney was not ineffective for failing to pursue a mental capacity line of defense. While Jeffery disputes the validity of the psychological evaluation, the record is clear that a psychological evaluation was conducted, and the report based on the evaluation found Jeffery criminally responsible and competent to stand trial. Jeffery himself admitted as much at the habeas hearing. Jeffery argues that the evaluation was inadequate due to his refusal to talk with the state evaluators about his case; however, other useful information was gathered during the remainder of the evaluation, which apparently provided a sufficient basis for a competency determination by the examiners. The state experts clearly did not feel that

Jeffery's refusal to answer some case-specific questions precluded a valid opinion regarding his capacity to understand the legality of his actions and his ability to assist and participate in his trial.

In *Wilson v. Greene*, 155 F.3d 396, 399-400 (4th Cir. 1998) the Fourth Circuit considered a defendant's argument that a mental health evaluation finding him competent and criminally responsible was "inadequate" because the defendant refused to discuss the details surrounding the alleged crime with the court-appointed psychologist conducting the evaluation. The Fourth Circuit found the defendant's argument unpersuasive as the state psychologist was able to interview the defendant for approximately 90 minutes and evaluate his cognitive processes, despite the fact that the defendant later refused to discuss details surrounding the crime. *Id.* at 402. The Fourth Circuit believed that this somewhat truncated examination provided a sufficient basis to form a medical opinion regarding the defendant's competency and criminal responsibility and denied the defendant's ineffective assistance of counsel claim, noting that "[t]o be reasonably effective, counsel was not required to second-guess the contents of this report." *Id.* at 403.

Accordingly, the undersigned **FINDS** that the state courts' reliance on the sufficiency of Jeffery's mental capacity evaluation in deciding that counsel was not ineffective was not contrary to, or an unreasonable application of, federal law. *See Wilson*, 155 F.3d at 403. Furthermore, the state courts' determination that Jeffery's counsel was not ineffective for declining to pursue a defense based on diminished capacity or competency following the evaluation conducted by the state experts was also not objectively unreasonable. *See United States v. Robinson*, 400 F. App'x 738, 739 (4th Cir. 2010) ("'Medical opinions are usually persuasive evidence on the question of whether a

sufficient doubt exists as to the defendant's competence' to require a competency hearing.") (quoting *United States v. General*, 278 F.3d 389, 398 (4th Cir.2002)) *see also Walton v. Angelone*, No. CIV.A. 7:99CV00940, 2002 WL 467142, at *12 (W.D. Va. Mar. 27, 2002) ("The Constitution does not give a defendant the right to choose the mental health professional of his liking."); *Pettinato v. Eagleton*, No. 2:05-1226-PMD-RSC, 2007 WL 3992494, at *28 fn.8 (D.S.C. Nov. 15, 2007) (defense counsel had no duty to "shop around" for a second opinion when petitioner was dissatisfied with results of first mental health evaluation); *Robinson v. United States*, No. 3:08-CR-42-1, 2012 WL 3782554, at *6 (N.D.W. Va. July 10, 2012), *report and recommendation adopted*, No. 3:08-CR-42-1, 2012 WL 3782552 (N.D.W. Va. Aug. 31, 2012) ("Because of the report's finding that [the petitioner] was competent to proceed, it was reasonable for counsel to proceed with [the petitioner's] case without requesting such a hearing."). The question presented to the state courts was not whether defense counsel "should have raised the competency issue; the court must ask whether trial counsel was 'unreasonable' in concluding that under the circumstances they should not have raised such a defense." *Basham v. United States*, 109 F. Supp. 3d 753, 819 (D.S.C. 2013), *aff'd*, 789 F.3d 358 (4th Cir. 2015). Considering the presence of the psychiatric evaluation and corresponding opinions in this case, the undersigned **FINDS** that the state courts' determination that counsel did not act unreasonably in declining to pursue a mental competency defense was not an unreasonable application of federal law. Therefore, this claim should be dismissed.

### 3. Failure to effectively cross-examine the victim

Jeffery faults his attorney for failing to effectively cross examine Ms. Quinn with factual evidence that contradicted her testimony. (ECF No. 2 at 5). Jeffery believes there was a "plethora of evidence" that could have been used to impeach Ms. Quinn, which his

attorney failed to use; specifically, Jeffery argues that counsel should have emphasized the inconsistency between Ms. Quinn's claims of "horrific acts of physical violence and torture" and the lack of medical evidence substantiating injuries. (ECF No. 2 at 5; ECF No. 16 at 10). The state courts determined that counsel was not ineffective in this regard, because counsel "very effectively pointed out that [Ms.] Quinn's account of her injuries was utterly unsubstantiated by the state, and suggested that the absence of records proved that she wasn't injured at all." (ECF No. 10-16 at 25). The state courts noted that, as the medical records revealed Ms. Quinn's injuries required stitches in her hand, attacking the State's case for having a total lack of corroborating medical records may have been a more effective strategy than introducing the medical records themselves. (*Id.*).

At the habeas hearing, Mr. Bayliss testified that the decision not to enter medical records in an attempt to impeach Ms. Quinn's testimony was "strategic" in that he did not wish to "aid the State in corroborating their theory." (ECF No. 10-26 at 70). Mr. Bayliss believed that, as the burden of proof was on the State, the better strategy was to point to the complete lack of supporting medical evidence as a fundamental weakness in the case. (*Id.*). On cross examination at trial, Ms. Quinn admitted that she had suffered no serious injuries or broken bones and that the only significant injuries she did receive, knife wounds, came from Ms. Creathers, not Jeffery. (ECF No. 20-2 at 75-76). Mr. Bayliss further seized on the lack of corroborating medical evidence in closing arguments and suggested that the lack of any medical evidence presented by the State which would substantiate Ms. Quinn's descriptions of severe beatings and torture meant that no such corroborating evidence existed. (ECF No. 20-4 at 98).

Counsel's decision to forego introducing the medical records to impeach Ms. Quinn's testimony, and instead pointing to the lack of medical records as a weakness in

the State's case was not so unreasonable that the state courts' decision should be overturned under the "doubly" deferential standard of review applicable to this claim. *Knowles*, 556 U.S. at 129. Mr. Bayliss's cross examination of Ms. Quinn, taken in conjunction with his closing argument emphasizing the total lack of corroborating medical evidence, allowed the jury to draw the clear inference that Ms. Quinn's description of her injuries was exaggerated. The jury's decision to recommend mercy despite the extremely graphic nature of Ms. Quinn's testimony, and the horrific abuse she described, suggests that defense counsel's attempts to weaken her credibility were at least partially successful. Therefore, the undersigned **FINDS** that, as the state courts did not render a decision that was "an unreasonable application of" *Strickland* by finding that defense counsel's performance in this regard was not constitutionally deficient, this claim should be dismissed. 28 U.S.C. § 2254(d)(1).

### 4. Failure to obtain surveillance tapes

Jeffery asserts that his counsel provided ineffective assistance by failing to obtain surveillance tapes from the Knights Inn motel, (ECF No. 2 at 5), and from Mr. Woolwine's property, which would have revealed that Ms. "Quinn did not appear to be a victim of a 'kidnapping.'" (ECF No. 10-13 at 10). At the habeas hearing, Jeffery explained that he also wanted Mr. Bayliss to obtain surveillance tapes from an Exxon gas station. (ECF No. 10-26 at 28). Jeffery believed that these tapes would reveal "what time I picked her up, what time I brought her back, and what time we left the second time." (*Id.* at 29). Mr. Bayliss was asked at the habeas hearing if he recalled any discussion regarding exculpatory surveillance tapes. (*Id.* at 71-72). Mr. Bayliss responded that he was "doubtful" any such tapes existed, but did not specifically recall discussing the tapes with Jeffery. (*Id.* at 72). There was no further evidence or testimony presented at the habeas hearing regarding

64

the allegedly overlooked surveillance tapes.

The state courts considered this claim and concluded that Jeffery "failed to demonstrate at the habeas hearing that surveillance tapes existed at the time of the offense." (ECF No. 10-16 at 24). The state courts also found that, assuming the tapes did exist, "there is no evidence that the tapes showed, or might have shown, anything that was helpful to the petitioner." (*Id.*). As such, the state courts concluded that Jeffery failed to establish a claim under *Strickland*. The undersigned **FINDS** that the state courts' ruling was not clearly contrary to existing federal law, was not an unreasonable determination of facts, and was not an unreasonable application of the *Strickland* standard. Under *Strickland*, counsel "has a duty to make reasonable investigations .... [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. "To prevail on an [ineffective assistance of counsel] claim based on a failure to investigate, a petitioner must specify 'what an adequate investigation would have revealed.'" *Walton v. Ballard*, No. 2:15-CV-11423, 2018 WL 1582737, at *7 (S.D.W. Va. Mar. 30, 2018), *appeal dismissed*, 738 F. App'x 159 (4th Cir. 2018), *cert. denied*, 139 S. Ct. 2743 (2019) (quoting *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990)).

Jeffery has not clearly articulated precisely what exculpatory information would have been captured by the surveillance tapes. Since much of his physical abuse of Ms. Quinn took place inside of his trailer and on top of a mountain in rural West Virginia, Jeffery is hard-pressed to demonstrate that his attorney overlooked critical exculpatory evidence. Furthermore, Ms. Quinn testified that, as she was being shuttled from place-to-place, she was held at knifepoint and Jeffery threatened to harm her if she told anyone of his abuse. Jeffery asserts that requiring him to show a reasonable probability that the

tapes would exculpate him in order to establish his attorney was ineffective is an unfair burden because his counsel's failure to secure the tapes precludes him from making such a showing. (ECF No. 16 at 11). However, simply alleging that surveillance tapes existed, and that they would have been exculpatory, is not enough to establish the prejudice prong of *Strickland*.

It was not an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" for the state courts to conclude that Jeffery had failed to establish the existence of surveillance videotapes, which contained images useful to his defense. 28 U.S.C. § 2254(d)(2); *see also Pinholster*, 563 U.S. at 181 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Merely asserting that an investigation would have uncovered exculpatory information without clearly identifying the nature of that exculpatory information is not enough to establish that counsel was ineffective under *Strickland. See Joyner v. Dir., Virginia Dep't of Correction,* No. 1:08CV626 CMHTCB, 2008 WL 3471847, at *9 (E.D. Va. Aug. 11, 2008) (state court was reasonable in rejecting petitioner's claim where he did not articulate what "exculpatory" evidence was presented by a videotape); *Gay v. Padula*, No. CA 3:07-4006-CMC-JRM, 2008 WL 4280380, at *8 (D.S.C. Sept. 10, 2008). Indeed, Jeffery was represented by counsel in his state habeas proceeding. Yet, Jeffery's counsel presented no evidence that surveillance cameras were in operation at the time of the criminal acts; that they were placed in a location and directed in such a way that they were likely to have captured relevant incidents; that they actually produced and stored video recordings; and that any useful video recordings would have been preserved and available at the time of trial counsel's appearance in the case.

Furthermore, even assuming it was unreasonable for the state courts not to accept Jeffery's assertion that relevant surveillance videos existed, the determination that Jeffery failed to show how he was prejudiced by the failure to obtain these tapes was not contrary to, and did not involve an unreasonable application of, federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d). The state courts appropriately rejected a claim that was "largely based on speculation." *Walton*, No. 2:15-CV-11423, 2018 WL 1582737, at *7. Jeffery alleged no facts before the state courts to support a reasonable probability—sufficient to undermine confidence in the outcome—that but for the alleged error of counsel, the result of the proceeding would be different, and Jeffery would have been acquitted. *See Strickland*, 466 U.S. at 694; see also *Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

Therefore, the undersigned **FINDS** that the state courts' determination on the issue of surveillance tapes was not so unreasonable that it was an error "beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. As such, Jeffery's claim cannot succeed on this ground as a matter of law.

### 5. Failure to include Jeffery in bench conferences

Jeffery asserts that his attorney provided ineffective assistance of counsel by failing to include him in several bench conferences during the course of the trial. Specifically, Jeffery objects to counsel's failure to consult him "on the record" regarding a juror's disclosure of familial ties to Ms. Quinn. (ECF No. 2 at 5-6). The undersigned has already considered Jeffery's objections to his absence at the bench conferences in the context of a substantive claim that his rights were deprived due to these absences and concluded that the state courts' determination on the matter was not unreasonable or contrary to federal

law. The state courts did not extensively address this claim as an independent claim of ineffective assistance of counsel; however, the state courts acknowledged the claim and found that Jeffery failed to assert a valid claim of ineffective assistance of counsel. (ECF No. 10-16 at 9, 23). Accordingly, as the state courts were not unreasonable in concluding that Jeffery's absence from these proceedings was harmless, there is a reasonable basis for their conclusion that he was not denied effective assistance in this matter. The undersigned **FINDS** that the state courts' determination that Jeffery failed to establish ineffective assistance of counsel on this issue is not unreasonable or contrary to the federal courts' application of the *Strickland* standard. Consequently, this ground must be dismissed.

### 6. Counsel failed to present promised defenses

Jeffery asserts that his attorney provided constitutionally deficient performance in failing to present a defense that fulfilled the representations he made in opening statement. (ECF No. 2 at 6). Specifically, Jeffery faults his attorney for stating that he would present favorable evidence in the form of witness testimony and medical evidence, and then failing to present the jury with the promised evidence. (*Id.*). Jeffery additionally accuses his attorney of negligence in failing "to call fifteen of sixteen witnesses listed with no approval of [sic] [Jeffery]." (*Id.*).

The state courts determined that Mr. Bayliss was not ineffective in his decision to forgo the presentation of certain witnesses and evidence. (ECF No. 10-16 at 26). This determination was based on Mr. Bayliss' testimony at the evidentiary hearing in which he explained why he was unable to present the witnesses identified by Jeffery. (*Id.* at 26-27). The state courts held that Mr. Bayliss was not ineffective in declining to call witnesses requested by Jeffery as "[t]here is nothing to indicate that any potential witness who was

named at the omnibus hearing would have testified favorably on [Jeffery's] behalf." (*Id.* at 26). The state courts noted that none of the allegedly exculpatory witnesses were present at the habeas hearing. (*Id.* at 26-27).

In opening statements at trial, Mr. Bayliss indicated to the jury that they would be presented with a witness, Mr. Nunley, who would testify that Ms. Quinn called him the night of the kidnapping to request his assistance in robbing Jeffery. (ECF No. 20-2 at 11). Mr. Bayliss further stated that Ashley Hemmings would provide testimony which would reveal that "what really happened" was a fight between Ms. Quinn and Ms. Creathers. (*Id.* at 12-13). Mr. Bayliss asserted that medical records would contradict Ms. Quinn's version of events. (*Id.* at 13).

At the habeas hearing, Mr. Bayliss stated that he had obtained the services of a private investigator and explored the viability of every witness identified by Jeffery. (ECF No. 10-26 at 70-71). Mr. Bayliss explained that "the results were generally the same with each one, the testimony was unfavorable, uncorroborated or [we] just couldn't find these persons." (*Id.* at 71). Mr. Bayliss further asserted that he had subpoenaed two witnesses who were present at trial. However, immediately prior to being called to testify, the witnesses "completely disavowed," their prior exculpatory statements given to the private investigator and informed Mr. Bayliss they were unwilling to provide the corroborating testimony under oath and in court. (*Id.* at 80-81). Mr. Bayliss recalled, in conjunction with the private investigator, examining the feasibility of every witness identified by Jeffery and being unable to find witnesses who would substantiate the version of events provided by him. (*Id.* 81-82). Mr. Bayliss specifically recalled Mr. Woolwine being a potential witness in the trial, but ultimately, he was unable to testify as his attorney informed Mr. Bayliss that Mr. Woolwine would invoke his constitutional right to be free

69

from self-incrimination if called to testify in Jeffery's trial. (*Id.* at 84-85).

In analyzing whether Jeffery's attorney provided constitutionally deficient performance in this regard, the test is not whether counsel "deviated from best practices or most common custom," but whether the "representation amounted to incompetence under 'prevailing professional norms.'" *Strickland*, 466 U.S., at 690. Moreover, as Jeffery is challenging a state court's finding that counsel was not deficient, he must contend with the dual deference due to state court decisions denying these claims. *Harrington,* 562 U.S. at 102, 105. In light of this demanding test, under which "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable," Jeffery has not successfully established the state court decision was erroneous. *Harrington,* 562 U.S. at 102, 105.

As detailed above, Mr. Bayliss provided cogent reasons for deciding to attack the State's case on the basis of a lack of corroborating medical evidence rather than introducing the evidence itself. While Mr. Bayliss did indicate that the jury would have "the opportunity to read the medical records" and discover that these records did not support Ms. Quinn's claims, he may have expected the State to introduce the medical records and changed gears when they declined to do so. In any case, electing to pivot and instead argue that the complete lack of medical records undermined the State's burden of proof was not a decision so obviously incompetent that it rendered counsel's performance objectively deficient and the state courts' ruling on the matter objectively unreasonable.

Regarding the witnesses mentioned in opening arguments, but never called to the stand, Mr. Bayliss' testimony at the habeas hearing revealed that these witnesses disavowed their expected testimony immediately before trial, explaining their absence from the defense's case. Jeffery does not dispute the account provided by Mr. Bayliss, that

the witnesses mentioned in opening statements revoked their testimony prior to trial.

Mr. Bayliss managed to secure the testimony of one witness who testified that the events as described by Ms. Quinn were inaccurate and that the true events of that night involved an altercation between Ms. Quinn and Ms. Creathers. (ECF No. 20-4 at 30). As noted by the state courts, Jeffery did not indicate with any specificity what exculpatory testimony he expected to be provided by the witnesses he faults his attorney for not presenting. Moreover, no witnesses appeared at the habeas hearing, suggesting that Mr. Bayliss's testimony regarding the absence of available exculpatory witnesses was correct. (ECF No. 10-16 at 26-27). Notwithstanding that the state courts ruled against Jeffery based partially on his failure to show the availability of exculpatory witnesses, his pleadings in federal court continue to lack any specificity with regard to identified witnesses defense counsel should have discovered, and the nature of the exculpatory testimony they would have provided. (ECF Nos. 2 at 6, 16 at 12-13).

The state courts' determination, in light of the record before it, that Mr. Bayliss had not performed below the constitutional minimum by failing to find allegedly exculpatory witnesses was not objectively unreasonable. "[T]he decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and on to which we must afford enormous deference." *United States v. Terry*, 366 F.3d 312, 317-18 (4th Cir. 2004). Accordingly, courts are generally "reluctant to find ineffective assistance based upon complaints regarding uncalled witnesses." *Lenz v. True*, 370 F.Supp.2d 446, 479 (W.D.Va.2005). A petitioner is usually unable to show that "he was prejudiced by the absence of a witness' testimony unless he demonstrates 'not only that [the] testimony would have been favorable, but also that the witness would have testified at trial.'" *Sanford v. Clarke*, No. 1:18CV303

(LMB/TCB), 2019 WL 472256, at *15 (E.D. Va. Feb. 6, 2019), *appeal dismissed*, 778 F. App'x 269 (4th Cir. 2019) (quoting *Alexander v. McClotter*, 775 F.2d 595, 602 (5th Cir. 1985)). As Jeffery failed, and continues to fail, to identify specific witnesses and provide a proffer of what exculpatory testimony they would have provided, the state courts did not err in determining that his attorney was not incompetent for declining to call these allegedly exculpatory witnesses. *See Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990) (finding that in "the absence of a proffer of testimony from a witness or witnesses he claims his attorney should have called," the petitioner was unable to establish ineffective assistance of counsel); *see also Hill v. United States*, No. 2:15-CR-00026, 2019 WL 3425049, at *17 (S.D.W. Va. May 21, 2019), *report and recommendation adopted*, No. 2:15-CR-00026, 2019 WL 2745852 (S.D.W. Va. July 1, 2019) ("Vague, unsupported allegations of ineffective assistance of counsel based on an attorney's failure to subpoena or call witnesses are insufficient under *Strickland*."); *United States v. King*, No. 1:08CR00041, 2014 WL 1906695, at *10 (W.D. Va. May 13, 2014) (finding the petitioner was unable to establish ineffective assistance of counsel based on counsel's failure to call witnesses where he did "not present any affidavits from these witnesses, indicating that they would have provided testimony exculpatory to [the petitioner] at trial."); *Walton v. Ballard*, No. 2:15-CV-11423, 2017 WL 8780139, at *17 (S.D.W. Va. Nov. 20, 2017), *report and recommendation adopted*, No. 2:15-CV-11423, 2018 WL 1582737 (S.D.W. Va. Mar. 30, 2018), *appeal dismissed*, 738 F. App'x 159 (4th Cir. 2018) ("[The petitioner's] bare statement that his counsel failed to call three unnamed alibi witnesses is insufficient."). As the state courts' determination that counsel was not deficient for his failure to present these defenses was not contrary to, nor an unreasonable application of, federal law, the undersigned **FINDS** that Respondent's summary judgment motion

should be granted as to this ground for relief.

### 7. Failure to prevent improper witness bolstering

Jeffery asserts that his attorney provided defective assistance in failing to object to the improper "bolstering" of Ms. Creathers's testimony. (ECF No. 2 at 6). The undersigned has already considered this claim and determined that, even assuming improper bolstering did take place, the state courts were not unreasonable in concluding that the bolstering was permissible due to the attack on Ms. Creathers's credibility made during opening arguments. As the state courts' conclusion that the bolstering was permitted was not unreasonable, the state courts' summary conclusion that Jeffery failed to establish ineffective assistance of counsel based on his attorney's failure to object likewise was not unreasonable or contrary to federal law. (ECF No. 10-16 at 23). Given the manner in which the testimony was offered by Ms. Creathers and the ruling of the state courts, Jeffery's lawyer could not have prevented the testimony. Accordingly, the undersigned **FINDS** no merit to this claim.

### 8. Failure to object to testimony regarding drug dealing

Jeffery contends that his attorney provided ineffective assistance of counsel by failing to object to testimony referring to drug activity that occurred at Jeffery's residence. (ECF No. 2 at 6). Jeffery raised the issue of testimony regarding his prior drug distribution activities in his amended habeas petition, arguing that the Circuit Court committed clear error in allowing the testimony to be introduced. (ECF No. 10-23 at 6). Jeffery also faulted his attorney for failing to object to the testimony. (*Id.* at 24-25).

At the habeas hearing, Mr. Bayliss asserted that he believed that "as a matter of strategy," the admission of testimony regarding drug usage was not destructive to Jeffery's defense. (ECF No. 10-26 at 82-83). Mr. Bayliss explained that his defense

strategy was to show that Jeffery, Ms. Quinn, and Ms. Creathers were "in a bit of a love triangle" and often used drugs together in an effort to convince the jury that the events of the night in question were in reality a conflict between Ms. Quinn and Ms. Creathers, and that Jeffery was the less-culpable party. (*Id*. at 83-84).

The state courts denied Jeffery's claim that his attorney should have objected to the testimony in question, finding that counsel made a strategic decision to forego objection, and the decision was not objectively deficient as "the questions asked, answers given, or items of evidence were clearly admissible.". (ECF No. 10-16 at 28). Jeffery has not successfully established that this determination was an unreasonable application of the *Strickland* standard.

Jeffery asserts that his counsel was clearly deficient in failing "to object to the State's obvious attempt to paint him as a bad person because he was a 'drug dealer.'" (ECF No. 16 at 14). Jeffery believes that being labeled as a drug dealer, as opposed to a person who merely engaged in drug use, was particularly damaging to his defense. (*Id*.). At a pre-trial conference at which Jeffery was present, the parties discussed the introduction of evidence related to Jeffery's drug use. (ECF No. 20-1 at 8). The prosecutor explained that the drug use was "intrinsic to the crime," and that Mr. Bayliss did not object to the introduction. Mr. Bayliss indicated his assent, indicating that he intended to use the victim's drug use to question their credibility. (*Id*. at 8-9). At trial, Ms. Quinn testified that Jeffery's actions were motivated by a mistaken belief that she had stolen his supply of drugs. (ECF No. 20-2 at 27). Ms. Creathers testified that she, Ms. Quinn, and Jeffery would take controlled substances together "daily." (ECF No. 20-3 at 20). Ms. Creathers also stated that she had witnessed Mr. Nunley buy drugs from Jeffery. (*Id*. at 105-06).

"Evidence when not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if it forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. Johnson*, 415 F. App'x 495, 503–04 (4th Cir. 2011) (quoting *United States v. Powers*, 59 F.3d 1460 (4th Cir.1995)). Evidence is intrinsic if it is necessary to "provide context relevant to the criminal charges." *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir.2007). Counsel did not provide deficient performance by failing to object to the admission of testimony regarding Jeffery's distribution of controlled substances. Counsel attempted to use the evidence of pervasive drug use to weaken the credibility of the State's witnesses as well as suggest that Jeffery was the less culpable party. Furthermore, Jeffery's use and distribution of controlled substance at the Knights Inn motel, which led to his subsequent belief that Ms. Quinn had stolen his property—including drugs he stored at his trailer—were intrinsic to an understanding of the crime. Therefore, a blanket objection to the introduction of Jeffery's drug activities was not likely to succeed.

"[A] strategy to attack credibility—even if that strategy elicits some assertion of prior drug deals—is not patently unreasonable." *Culbreath v. Weedon*, No. CV 6:15-200-SB-KFM, 2016 WL 3436440, at *8 (D.S.C. Jan. 27, 2016), *report and recommendation approved*, No. CV 6:15-200-SB, 2016 WL 3385090 (D.S.C. June 20, 2016). Jeffery asserts that he does not object to the admission of evidence establishing his drug use, but rather to the admission of evidence showing his involvement in drug distribution. (ECF No. 16 at 14). However, it is clear from the testimony of Ms. Quinn and Ms. Creathers that Jeffery was the source of the drugs that the three used at the motel. Trying to present evidence of the events leading up to Ms. Quinn's beating without disclosing Jeffery's distribution of

drugs would have been difficult. Trying to preclude evidence of Jeffery's drug dealing while still managing to attack the credibility of the State's star witnesses would have been nearly impossible. Under the circumstances, Mr. Bayliss's failure to successfully exclude all testimony regarding Jeffery's drug dealing was not so objectively deficient as to render the state courts' finding (that Mr. Bayliss was not ineffective in this regard) "beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103.

Finally, it would not have been unreasonable for the state courts to conclude that Jeffery failed to demonstrate prejudice stemming from the failure to object to testimony regarding his drug dealing. The references to Jeffery's drug distribution were limited to a few stray remarks scattered throughout the course of a lengthy trial. Given that Jeffery was charged in a capital case with committing particularly "heinous actions," the admission of evidence that Jeffery sold drugs, rather than merely used them, "was unlikely to substantially sway the jury;" particularly, given the powerful evidence of guilt presented by the State. *See United States v. Basham*, 561 F.3d 302, 328 (4th Cir. 2009). Accordingly, the undersigned **FINDS** that state courts' decision rejecting this claim was not an unreasonable application of, or contrary to, federal law.

### 9. Failure to challenge testimony describing bloody clothes

Jeffery alleges that Mr. Bayliss provided constitutionally deficient performance by failing to object to "testimonial references" to bloody clothes, which were never introduced into evidence. (ECF No. 2 at 6). The state courts considered Jeffery's substantive claim that references to the bloody clothing were admitted in error and concluded that the claim failed because "[t]he state presented photographs of bloody clothing, and the petitioner possessed no constitutional right to have the clothes, themselves, waved before the jury." (ECF No. 10-16 at 27). The state courts did not directly

address Jeffery's independent claim that his counsel was ineffective in failing to challenge references to the bloody clothing, (ECF No. 10-13 at 13), and instead summarily denied Jeffery's allegations regarding his counsel's failure to make objections. (ECF No. 10-16 at 28).

The state courts' reasoning in dismissing Jeffery's claim that the testimony regarding bloody clothes was admitted in error provides a "reasonable basis" for its summary denial of his claim of ineffective assistance based on counsel's failure to object to the same. *Pinholster*, 563 U.S. at 188. At trial, Trooper Ward testified that he observed bloody clothing when he entered Jeffery's motel room. (ECF No. 20-2 at 125). He identified a photograph of tennis shoes as being the same shoes he had observed in the motel room. (*Id.* at 125-26). Through the testimony of Corporal Cervera, the State admitted several photographs of evidence seized from the motel room. (*Id.* at 155-56). These photographs included a picture depicting bloody jeans seized from the motel room. (*Id.* at 158). DNA tests later revealed that it was Ms. Quinn's blood on the jeans. (*Id.* at 184-85, 188).

Jeffery did not present the state courts with any legal basis for his assertion that it was improper to introduce a photograph of the clothing seized from his motel room rather than present the jury with the actual clothing, and he continues to fail to do so in his federal pleadings. Counsel was not objectively deficient in declining to object to the admission of testimony describing, and photographs depicting, bloody clothing found at Jeffery's motel room as there is no federal or state requirement that the actual clothing be introduced into evidence in lieu of photographs. *See Swinson v. Dir., Dep't of Corr.*, No. 3:14CV100, 2015 WL 1185951, at *11 (E.D. Va. Mar. 13, 2015) (no right to have BB gun presented rather than photograph depicting BB gun); *see also Cobb v. Clarke*, No.

3:15CV214, 2015 WL 7283125, at *8 (E.D. Va. Nov. 17, 2015) (no right to have actual cellphone introduced at trial rather than photograph depicting cellphone); *United States v. Blaylock*, 535 F.3d 922, 928 (8th Cir. 2008) (finding that no federal rule "prohibits the government from relying upon testimony from officers who seized items during a search, instead of introducing the items themselves."); *State v. Adkins*, 191 W. Va. 480, 483 (1994) (evidence can be introduced by photograph when photographs are identified by a witness familiar with the evidence). "It is certainly reasonable for counsel not to raise unmeritorious claims." *Truesdale v. Moore*, 142 F.3d 749, 756 (4th Cir. 1998). As there was no rule, which would require the State to present the physical evidence described and depicted at trial, counsel did not provide objectively deficient performance in declining to raise this objection.

A second and independently sufficient basis for the state courts' rejection of this claim is that Jeffery has not succeeded in showing that he suffered any prejudice due to the alleged failing by his counsel. While Jeffery does not describe in his federal petition why he wanted the clothing introduced at trial, at his habeas hearing he explained that introduction of the clothing—particularly the bloody jeans—"could show where the blood was, they would see that the blood was up around my knee area where [Ms. Quinn] laid her hand." (ECF No. 10-26 at 30). This, Jeffery believed, would be exculpatory because the jury would realize there was no blood-splatter on the cuffs of the jeans, as would be expected if Jeffery had been kicking Ms. Quinn. (*Id.*). Undoubtedly, such an approach would have failed. At best, seeing the actual blood-stained jeans that were worn by Jeffery during the crime would have convinced the jury of his active involvement in Ms. Quinn's beating. At worst, the jeans would have inflamed the jury, eliminating any feelings of mercy held by the jurors. As Jeffery has not provided any cogent explanation as to how he

was prejudiced by this alleged failing, and the only explanation apparent in the record does not support a finding of prejudice, the undersigned **FINDS** that the state courts' determination was neither unreasonable nor contrary to federal law.

### 10. Counsel failed to cross-examine a witness

Jeffery asserts that his counsel provided ineffective assistance by failing to "effectively cross-examine State witness Hancock" regarding pending burglary charges. (ECF No. 2 at 6). Jeffery raised a similar claim before the state courts, alleging that counsel erroneously "abandoned" his attempt to impeach State witness, Erica Hancock. (ECF No. 10-13 at 13). The state courts acknowledged Jeffery's claim that his attorney was ineffective in failing to effectively cross-examine this witness, but summarily rejected it. (ECF No. 10-16 at 10, 28).

Prior to trial, the Circuit Court granted the State's *motion in limine* seeking to preclude Mr. Bayliss from cross-examining Erica Hancock regarding a burglary charge that was pending against her. (ECF No. 20-1 at 5-7). The prosecution pointed out that the West Virginia Rules of Evidence did not allow impeachment based on a criminal charge; rather, to impeach the witness, she must have been convicted of a felony offense or a crime involving truthfulness. In the end, Ms. Hancock did not testify at trial. However, a recorded 911 call that she made was played for the jury. (ECF No. 20-2 at 115).

As Respondent emphasizes, (ECF No. 14 at 18-19), Jeffery's claim is frivolous, because Mr. Bayliss was precluded from cross-examining Ms. Hancock regarding her pending burglary charges for two reasons. First, because the Circuit Court forbade him from doing so. Second, and more fundamentally, because Ms. Hancock did not testify; therefore, Mr. Bayliss had no opportunity to cross-examine her. Jeffery does not address either of these points in his summary of the claim, (ECF No. 2 at 6), and does not address

Respondent's arguments regarding this claim in his Response. (ECF No. 16).

Clearly, the state courts' summary denial of this claim was not unreasonable or contrary to federal law. Mr. Bayliss was not ineffective in failing to cross-examine Ms. Hancock regarding her pending burglary charge, because it was not possible to cross-examine a 911 recording. To the extent Jeffery contends that Mr. Bayliss should have called Ms. Hancock as a defense witness in order to confront her with the pending burglary charges, this claim is entirely baseless. Ms. Hancock clearly was not a helpful witness for Jeffery's defense. To the contrary, she saw Jeffery hit and kidnap Ms. Quinn. Moreover, Ms. Hancock was the individual who called 911 out of fear for Ms. Quinn's safety. Consequently, it would have been reckless, not to mention in violation of a court order, if Mr. Bayliss had called Ms. Hancock as a witness solely to impeach her credibility.

The state courts additionally had a reasonable basis for rejecting this claim under *Strickland's* prejudice prong. If Jeffery believed Ms. Hancock's burglary charges would show that she was involved in the robbery of his trailer, this was not seriously contested at trial. Ms. Creathers testified that, although Ms. Hancock blamed Ms. Quinn for the robbery, the items stolen from Jeffery's residence were found in Ms. Hancock's vehicle. (ECF No. 20-3 at 26-27). Additional corroboration of Ms. Hancock's participation in the burglary of Jeffery's trailer would have been of marginal utility to the defense and was not likely to change the verdict. Thus, the undersigned **FINDS** As the state courts' summary denial of this claim was neither unreasonable nor contrary to federal law.

### 11. Failure to object to 911 calls

Jeffery contends that he was deprived of his constitutional right to effective representation of counsel by his attorney's failure to object to the admission of recorded 911 calls, although the witness who introduced the call did not personally prepare the

80

recording. (ECF No. 2 at 6). This issue was addressed above in considering Jeffery's independent claim for relief based on the allegedly improper admission of the calls. As the undersigned has already considered this claim and concluded that the state courts did not commit an error in concluding that the admission was not erroneous, Jeffery is unable to show that the state courts erred in finding that his attorney was not ineffective by failing to object to the admission of the calls. An objection based on Mr. Phantom's inability to authenticate the recorded calls would have failed. As the failure of defense counsel to make a frivolous motion can never support a claim of ineffective assistance of counsel, *see Moody v. Polk,* 408 F.3d 141, 151 (4th Cir. 2005), the undersigned **FINDS** that this claim is without merit.

### H. Cumulative Error

Jeffery asserts that the cumulation of errors that occurred at his trial rendered his trial constitutionally deficient. (ECF No. 2 at 19). The state courts considered and rejected this claim finding that, as Jeffery identified no significant error, the doctrine of cumulative error did not apply. (ECF No. 10-16 at 28).

"Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (internal quotations and citations omitted). To reverse for cumulative error, the errors must "so fatally infect the trial that they violated the trial's fundamental fairness." *Basham*, 561 F.3d at 330 (quoting *United States v. Bell*, 367 F.3d 452, 471 (5th Cir.2004)). However, "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error, not the cumulative effect of all of counsel's actions deemed deficient." *Fisher v. Angelone*, 163 F.3d 835, 852 n.9 (4th Cir. 1998). For

cumulative error to apply then, a court must first conclude that constitutional errors did in fact occur, and while harmless individually, the aggregate effect of the errors was to effectuate grave constitutional harm. *Id.*

As the undersigned has concluded that the state courts' denial of all of Jeffery's individual claims was not inappropriate under the standard governing § 2254 petitions, there are no constitutional errors on which Jeffery could base a claim of cumulative error. Therefore, the undersigned **FINDS** that Jeffery's claim of cumulative error cannot succeed as a matter of law.

In summary, the undersigned has considered all of Jeffery's claims and concluded that they clearly fail to state a claim which entitles him to relief; therefore, the undersigned **FINDS** that Jeffery's § 2254 petition should be dismissed.

## IV.    Proposal and Recommendations

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** the following:

1.  Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2), be **DENIED**;

2.  Respondent's Motion for Summary Judgment, (ECF No. 11), be **GRANTED**;

3.  This action be **DISMISSED, with prejudice.**

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, The parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the

Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner and counsel of record.

**FILED:** November 22, 2019

Cheryl A. Eifert
United States Magistrate Judge